# MEESE, ATTORNEY GENERAL OF THE UNITED STATES, ET AL. *v.* KEENE

No. 85–1180.   Argued December 2, 1986—Decided April 28, 1987

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. BLACKMUN, J., filed an opinion dissenting in part, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 485. SCALIA, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Ayer* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Paul J. Larkin, Jr.,* and *Leonard Schaitman.*

*John G. Donhoff, Jr.,* argued the cause for respondent. With him on the brief was *Stephen R. Barnett.**

JUSTICE STEVENS delivered the opinion of the Court.

The Foreign Agents Registration Act of 1938, 52 Stat. 631–633, as amended in 1942 and 1966, 22 U. S. C. §§ 611–621 (Act), uses the term "political propaganda," as defined in the Act, to identify those expressive materials that must comply with the Act's registration, filing, and disclosure requirements. The constitutionality of those underlying requirements and the validity of the characteristics used to define the regulated category of expressive materials are not at issue in this case. The District Court concluded, however, that Congress violated the First Amendment by using the term "political propaganda" as the statutory name for the regulated category of expression.

Appellee, an attorney and a member of the California State Senate, does not want the Department of Justice and the public to regard him as the disseminator of foreign political propaganda, but wishes to exhibit three Canadian motion picture films that have been so identified.[1] The films, distrib-

---

*Daniel J. Popeo* and *George C. Smith* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Daniel Marcus, Susan W. Shaffer, Charles S. Sims, Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solicitor General, *Lawrence S. Kahn,* Deputy Solicitor General, and *Sanford M. Cohen,* Assistant Attorney General; for the Freedom to Read Foundation by *Robert Steven Chapman;* and for Playboy Enterprises, Inc., et al by *Bruce J. Ennis, Jr., Burton Joseph,* and *Maxwell J. Lillienstein.*

[1] In a letter dated January 13, 1983, the Chief of the Registration Unit of the Internal Security Section of the Criminal Division of the Department of Justice notified the National Film Board of Canada (NFBC) that these three films were "political propaganda," and requested that the NFBC

uted by the NFBC,[2] deal with the subjects of nuclear war and acid rain.[3] Appellee brought suit in the Federal District Court for the Eastern District of California on March 24, 1983, to enjoin the application of the Act to these three films. On May 23, 1983, the District Court denied appellants' motion to dismiss and granted appellee's motion for a preliminary injunction. The injunction prohibited appellants from designating the films as "political propaganda" and from subjecting them to the labeling and reporting requirements of the Act. The court issued findings of fact and conclusions of law on September 7, 1983. *Keene* v. *Smith*, 569 F. Supp. 1513. The court held that the risk of damage to Keene's reputation established his standing to challenge the constitutionality of the statute's use of the term "propaganda," and that appellee had established his entitlement to a preliminary injunction.[4]

On September 12, 1985, the District Court granted summary judgment for appellee and a permanent injunction against enforcement of any portion of the Act which incorporates the term "political propaganda." 619 F. Supp. 1111.

---

comply with the labeling and reporting requirements imposed by § 4 of the Act, 22 U. S. C. § 614. App. 18.

[2] The NFBC (New York office) has been registered with the Attorney General as an agent of a foreign principal, the NFBC, since 1947, pursuant to 22 U. S. C. § 612. Second Declaration of Joseph E. Clarkson ¶ 4, App. 57.

[3] The films are entitled If You Love This Planet, Acid Rain: Requiem or Recovery, and Acid From Heaven. The first film concerns "the environmental effects of nuclear war." Complaint ¶ 1, App. 10. "Acid rain" is formed when nitrogen oxides and sulfur dioxide, products of fossil fuel combustion, are discharged into the atmosphere; converted to sulfates, nitrates, sulfuric acids, and nitric acids through various chemical reactions; and then deposited as precipitation. See 1 F. Grad, Treatise on Environmental Law § 2.09, pp. 2–578 to 2–579 (1986).

[4] *Keene* v. *Smith*, 569 F. Supp., at 1518, 1522. The District Court found that appellee lacked standing to challenge the labeling requirement that the Act imposes on the agent of the foreign principal. *Id.*, at 1519. That ruling is not now before this Court.

The District Court opined that the term "propaganda" is a semantically slanted word of reprobation; that the use of such a denigrating term renders the regulated materials unavailable to American citizens who wish to use them as a means of personal expression; and that since there was no compelling state interest to justify the use of such a pejorative label, it was an unnecessary, and therefore invalid, abridgment of speech. The court amended its judgment on October 29, 1985, limiting the permanent injunction against enforcement of the Act to the three films at issue in this case.

We noted probable jurisdiction of the Attorney General's appeal under 28 U. S. C. § 1252, 475 U. S. 1117 (1986), and we now reverse.

Before we discuss the District Court's holding on the First Amendment issue, we briefly describe the statutory scheme and determine that appellee has standing to challenge the Act.

I

The statute itself explains the basic purpose of the regulatory scheme. It was enacted:

> "[T]o protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities and other activities for or on behalf of foreign governments, foreign political parties, and other foreign principals so that the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in the light of their associations and activities." 56 Stat. 248–249.

See *Viereck* v. *United States*, 318 U. S. 236, 244 (1943).

The Act requires all agents of foreign principals to file detailed registration statements, describing the nature of their business and their political activities. The registration requirement is comprehensive, applying equally to agents of

friendly, neutral, and unfriendly governments. Thus, the New York office of the NFBC has been registered as a foreign agent since 1947 because it is an agency of the Canadian government. The statute classifies the three films produced by the Film Board as "political propaganda" because they contain political material intended to influence the foreign policies of the United States, or may reasonably be adapted to be so used.

When the agent of a foreign principal disseminates any "political propaganda," § 611(j), in the United States mails or in the channels of interstate commerce, he or she must also provide the Attorney General with a copy of the material and with a report describing the extent of the dissemination.[5] In addition, he or she must provide the recipient of the material with a disclosure statement on a form prescribed by the Attorney General.[6] When an agent seeks to disseminate

---

[5] Title 22 U. S. C. § 614(a) provides:

"Every person within the United States who is an agent of a foreign principal and required to register under the provisions of this subchapter and who transmits or causes to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce any political propaganda for or in the interests of such foreign principal (i) in the form of prints, or (ii) in any other form which is reasonably adapted to being, or which he believes will be, or which he intends to be, disseminated or circulated among two or more persons shall, not later than forty-eight hours after the beginning of the transmittal thereof, file with the Attorney General two copies thereof and a statement, duly signed by or on behalf of such agent, setting forth full information as to the places, times, and extent of such transmittal."

[6] Section 614(b) provides:

"It shall be unlawful for any person within the United States who is an agent of a foreign principal and required to register under the provisions of this subchapter to transmit or cause to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce any political propaganda for or in the interests of such foreign principal (i) in the form of prints, or (ii) in any other form which is reasonably adapted to being, or which he believes will be or which he intends to be, disseminated or circulated among two or more persons, unless such political propaganda is conspicuously marked at its beginning with, or prefaced

such political advocacy material, he or she must first label that material with certain information, the agent's identity, and the identity of the principal for whom he or she acts. The standard form to be used with films reads as follows:

> "This material is prepared, edited, issued or circulated by (name and address of registrant) which is registered with the Department of Justice, Washington, D. C. under the Foreign Agents Registration Act as an agent of (name and address of foreign principal). Dissemination reports on this film are filed with the Department of Justice where the required registration statement is available for public inspection. Registration does not indicate approval of the contents of this material by the United States Government." App. 16, 59.

It should be noted that the term "political propaganda" does not appear on the form.

The statutory definition of that term reads as follows:

> "(j) The term 'political propaganda' includes any oral, visual, graphic, written, pictorial, or other communica-

---

or accompanied by, a true and accurate statement, in the language or languages used in such political propaganda, setting forth the relationship or connection between the person transmitting the political propaganda or causing it to be transmitted and such propaganda; that the person transmitting such political propaganda or causing it to be transmitted is registered under this subchapter with the Department of Justice, Washington, District of Columbia, as an agent of a foreign principal, together with the name and address of such agent of a foreign principal and of such foreign principal; that, as required by this subchapter, his registration statement is available for inspection at and copies of such political propaganda are being filed with the Department of Justice; and that registration of agents of foreign principals required by the subchapter does not indicate approval by the United States Government of the contents of their political propaganda. The Attorney General, having due regard for the national security and the public interest, may by regulation prescribe the language or languages and the manner and form in which such statement shall be made and require the inclusion of such other information contained in the registration statement identifying such agent of a foreign principal and such political propaganda and its sources as may be appropriate."

tion or expression by any person (1) which is reasonably adapted to, or which the person disseminating the same believes will, or which he intends to, prevail upon, indoctrinate, convert, induce, or in any other way influence a recipient or any section of the public within the United States with reference to the political or public interests, policies, or relations of a government or a foreign country or a foreign political party or with reference to the foreign policies of the United States or promote in the United States racial, religious, or social dissensions, or (2) which advocates, advises, instigates, or promotes any racial, social, political, or religious disorder, civil riot, or other conflict involving the use of force or violence in any other American republic or the overthrow of any government or political subdivision of any other American republic by any means involving the use of force or violence." § 611(j).

## II

In determining whether a litigant has standing to challenge governmental action as a violation of the First Amendment, we have required that the litigant demonstrate "a claim of specific present objective harm or a threat of specific future harm." *Laird* v. *Tatum*, 408 U. S. 1, 14 (1972). In *Laird*, the plaintiffs alleged that the intelligence-gathering operations of the United States Army "chilled" the exercise of their First Amendment rights because they feared that the defendants might, in the future, make unlawful use of the data gathered. We found that plaintiffs lacked standing; the Army's intelligence-gathering system did not threaten any cognizable interest of the plaintiffs. While the governmental action need not have a direct effect on the exercise of First Amendment rights, we held, it must have caused or must threaten to cause a direct injury to the plaintiffs. *Id.*, at 12–13. The injury must be "'distinct and palpable.'" *Allen* v. *Wright*, 468 U. S. 737, 751 (1984) (citations omitted).

Appellee's allegations and affidavits establish that his situation fits squarely within these guidelines. To be sure, the identification as "political propaganda" of the three films Keene is interested in showing does not have a direct effect on the exercise of his First Amendment rights; it does not prevent him from obtaining or exhibiting the films. As the District Court recognized, however, "[w]hether the statute in fact constitutes an abridgement of the plaintiff's freedom of speech is, of course, irrelevant to the standing analysis." 619 F. Supp., at 1118. While Keene did not and could not allege that he was unable to receive or exhibit the films at all, he relies on the circumstance that he wished to exhibit the three films, but was "deterred from exhibiting the films by a statutory characterization of the films as 'political propaganda.'" 569 F. Supp., at 1515. If Keene had merely alleged that the appellation deterred him by exercising a chilling effect on the exercise of his First Amendment rights, he would not have standing to seek its invalidation. See *Laird*, *supra*, at 13–14.

We find, however, that appellee has alleged and demonstrated more than a "subjective chill"; he establishes that the term "political propaganda" threatens to cause him cognizable injury. He stated that "if he were to exhibit the films while they bore such characterization, his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired." 569 F. Supp., at 1515. In support of this claim, appellee submitted detailed affidavits, including one describing the results of an opinion poll[7] and another containing the

---

[7] The poll was entitled Gallup Study of The Effect of Campaign Disclosures on Adults' Attitudes Toward Candidates (July, 1984). App. 78–98. The study was based on a telephone survey, in which five questions were posed to a representative national sample of adults. The questions tested the effect that publicizing various events associated with a candidate running for the state legislature would have on his candidacy. One of the surveyed events was that the political candidate "arranged to show to [the] public three foreign films that the Justice Dept. had classified as 'Political

views of an experienced political analyst,[8] supporting the conclusion that his exhibition of films that have been classified as "political propaganda" by the Department of Justice would substantially harm his chances for reelection and would adversely affect his reputation in the community. The affidavits were uncontradicted.

---

Propaganda.'" App. 86. The poll concluded that if this event occurred, 49.1% of the public would be less inclined to vote for the candidate. *Ibid.*; see also *id.*, at 93–94 (sampling tolerances; 95% confidence level that sampling error is less than four percentage points).

After examining the survey data, the survey research practitioner who had designed the survey concluded that the charge of showing political propaganda "would have a seriously adverse effect on a California State Legislature candidate's chances [for election] if this charge were raised during a campaign." Declaration of Mervin Field ¶ 5, App. 69. The District Court found that this declaration, "neither rebutted nor impeached by the defendants, establishes beyond peradventure of a doubt that whoever disseminates materials officially found to be 'political propaganda' runs the risk of being held in a negative light by members of the general public." 619 F. Supp. 1111, 1124 (1985) (footnote omitted). In addition, a principal political fundraiser and adviser to appellee, Harry Bistrin, stated: "I have no doubt but that some members of the North Coast [of California] press, present political adversaries, and future opponents, would openly seize upon the opportunity to utilize the government's reporting, dissemination and label requirements under [the Act] to their benefit by portraying the plaintiff as a disseminator of 'foreign political propaganda.' For these reasons the plaintiff has a compelling interest, perhaps more than most citizens, to ensure that the exercise of his first amendment rights does not 'boomerang' to be utilized as a deadly weapon against him in his political career." Declaration in Support of Plaintiff's Motion for a Preliminary Injunction, App. 30.

[8] "Designating material as 'political propaganda,' . . . denigrates the material and stigmatizes those conveying it, in a manner that mere designation of the material as 'political advocacy' would not. It is my professional judgment that knowledge of such a designation would be extremely likely to deter persons from viewing or reading such materials and, diminish and/or slant its communicative value, in a manner likely to make the reader or viewer suspicious of the material, far less likely to credit it or accept its conclusions." Declaration of Leonard W. Doob ¶ 9, App. 103. The declarant is Senior Research Associate and Sterling Professor Emeritus of Psychology at Yale University.

In ruling on the motion for summary judgment, the District Court correctly determined that the affidavits supported the conclusion that appellee could not exhibit the films without incurring a risk of injury to his reputation and of an impairment of his political career. The court found that the Act "puts the plaintiff to the Hobson's choice of foregoing the use of the three Canadian films for the exposition of his own views or suffering an injury to his reputation." 619 F. Supp., at 1120. While appellee does not allege that the Act reduces the number of people who will attend his film showings, see Brief for Appellee 15, n. 14, he cites "the risk that the much larger audience that is his constituency would be influenced against him because he disseminated what the government characterized as the political propaganda of a foreign power." *Ibid.* See also Tr. of Oral Arg. 36 (the label "raises the hackles of suspicion on the part of the audience"). As the affidavits established, this suspicion would be a substantial detriment to Keene's reputation and candidacy.

It is, of course, possible that appellee could have minimized these risks by providing the viewers of the films with an appropriate statement concerning the quality of the motion pictures—one of them won an "Oscar" award from the Academy of Motion Picture Arts and Sciences as the best foreign documentary in 1983—and his reasons for agreeing with the positions advocated by their Canadian producer concerning nuclear war and acid rain. Even on that assumption, however, the need to take such affirmative steps to avoid the risk of harm to his reputation constitutes a cognizable injury in the course of his communication with the public. This case is similar to *Lamont* v. *Postmaster General*, 381 U. S. 301 (1965), in which we did not question that petitioner had standing to challenge a statute requiring the Postmaster General to hold all "communist political propaganda" originating abroad and not release it to the addressee unless that individual made a written request to the Post Office for deliv-

ery of the material. Although the statute was directed to the Postmaster General, it affected addressee Lamont just as the Act under consideration affected Keene. The necessity of going on the record as requesting this political literature constituted an injury to Lamont in his exercise of First Amendment rights. Likewise, appellee is not merely an undifferentiated bystander with claims indistinguishable from those of the general public, as the Government argues; he would have to take affirmative steps at each film showing to prevent public formation of an association between "political propaganda" and his reputation. Moreover, while these steps might prevent or mitigate damage to his reputation among those members of the public who do view the films, they would be ineffective among those citizens who shun the film as "political propaganda." [9]

Our cases recognize that a mere showing of personal injury is not sufficient to establish standing; we have also required that the injury be "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen* v. *Wright,* 468 U. S., at 751; see also *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 472 (1982). Because the alleged injury stems from the Department of Justice's enforcement of a statute that employs the term "political propaganda," we conclude that the risk of injury to appellee's reputation "fairly can be traced" to the defendant's conduct. *Simon* v. *Eastern Kentucky Welfare Rights Organization,* 426 U. S. 26, 41 (1976).

Moreover, enjoining the application of the words "political propaganda" to the films would at least partially redress the reputational injury of which appellee complains. The Attorney General argues that an injunction would not provide the

---

[9] See *Block* v. *Meese,* 253 U. S. App. D. C. 317, 322, 793 F. 2d 1303, 1308 (1986) (sole distributor of If You Love This Planet has standing to challenge classification of film as "political propaganda"; potential customers declined to take the film because of the classification).

relief sought, because appellee's constituents and others may continue to react negatively to his exhibition of films once they have been labeled as "political propaganda." However, appellee's alleged harm occurs because the Department of Justice has placed the legitimate force of its criminal enforcement powers behind the label of "political propaganda." A judgment declaring the Act unconstitutional would eliminate the need to choose between exhibiting the films and incurring the risk that public perception of this criminal enforcement scheme will harm appellee's reputation. Appellee declared his intent "to continue to exhibit the three films periodically in the future, but only if the defendants are permanently enjoined from classifying the films as 'political propaganda.'" Declaration of Barry Keene As Regards Having Exhibited the Three Films, App. 110. Thus, the threatened injury alleged in the complaint is "likely to be redressed by a favorable decision." See *Valley Forge*, 454 U. S., at 472, and cases cited *ibid.*, at n. 9.

## III

We begin our examination of the District Court's ruling on the First Amendment issue by noting that the term "political propaganda" has two meanings. In popular parlance many people assume that propaganda is a form of slanted, misleading speech that does not merit serious attention and that proceeds from a concern for advancing the narrow interests of the speaker rather than from a devotion to the truth. See, *e. g.*, Declaration of Edwin Newman, Correspondent for NBC News, App. 107–108. Casualty reports of enemy belligerents, for example, are often dismissed as nothing more than "propaganda." As defined in the Act, the term political propaganda includes misleading advocacy of that kind. See 22 U. S. C. § 611(j). But it also includes advocacy materials that are completely accurate and merit the closest attention and the highest respect. Standard reference works include both broad, neutral definitions of the word "propaganda" that

are consistent with the way the word is defined in this statute,[10] and also the narrower, pejorative definition.[11]

Appellee argues that the statute would be unconstitutional even if the broad neutral definition of propaganda were the only recognized meaning of the term because the Act is "a Classic Example of Content-Based Government Regulation of Core-Value Protected Speech."[12]  As appellee notes, the Act's reporting and disclosure requirements are expressly conditioned upon a finding that speech on behalf of a foreign principal has political or public-policy content.

The District Court did not accept this broad argument.  It found that the basic purpose of the statute as a whole was "to inform recipients of advocacy materials produced by or under the aegis of a foreign government of the source of such materials" (emphasis deleted), and that it could not be gainsaid that this kind of disclosure serves rather than disserves the First Amendment.[13]  The statute itself neither prohibits nor censors the dissemination of advocacy materials by agents of foreign principals.

The argument that the District Court accepted rests not on what the statute actually says, requires, or prohibits, but rather upon a potential misunderstanding of its effect.  Simply because the term "political propaganda" is used in the text of the statute to define the regulated materials, the court assumed that the public will attach an "unsavory connotation,"

---

[10] See, e. g., Webster's Third New International Dictionary 1817 (1981 ed.) ("doctrines, ideas, argument, facts, or allegations spread by deliberate effort through any medium of communication in order to further one's cause or to damage an opposing cause").

[11] See, e. g., Webster's New World Dictionary, College Edition 1167 (1968) ("now often used disparagingly to connote deception or distortion"); The New Columbia Encyclopedia 2225 (1975) ("[A]lmost any attempt to influence public opinion, including lobbying, commercial advertising, and missionary work, can be broadly construed as propaganda.  Generally, however, the term is restricted to the manipulation of political beliefs").

[12] Brief for Appellee 20.

[13] See 619 F. Supp., at 1125.

619 F. Supp., at 1125, to the term and thus believe that the materials have been "officially censured by the Government." *Ibid.* The court further assumed that this denigration makes this material unavailable to people like appellee, who would otherwise distribute such material, because of the risk of being seen in an unfavorable light by the members of the public who misunderstand the statutory scheme.[14] According to the District Court, the denigration of speech to which the label "political propaganda" has been attached constitutes "a conscious attempt to place a whole category of materials beyond the pale of legitimate discourse," *id.*, at 1126, and is therefore an unconstitutional abridgment of that speech. We

---

[14] The risk of this reputational harm, as we have held earlier in this opinion, is sufficient to establish appellee's standing to litigate the claim on the merits. Whether the risk created by the Act violates the First Amendment is, of course, a separate matter. The crux of the District Court's analysis of this latter issue is set forth in this paragraph:

"With respect to the evidentiary question—does the phrase 'political propaganda,' when officially applied by officials of the United States Department of Justice, abridge speech—the Court has little difficulty. The declaration supplied by Mervin Field, neither rebutted nor impeached by the defendants, establishes beyond peradventure of a doubt that whoever disseminates materials officially found to be 'political propaganda' runs the risk of being held in a negative light by members of the general public. *See* Gallup Study of the Effect of Campaign Disclosures on Adults' Attitudes Toward Candidates, July, 1984; Plaintiff's Exhibit A, Declaration of Mervin D. Field, at 3. For this reason, the Court finds that Congress' use of the phrase 'political propaganda' to describe the materials subject to the registration and reporting requirements constitutes a burden on speech by making such materials unavailable to all but the most courageous. Since the exercise of First Amendment rights often requires an act of courage, it is important to note that the courage required by the operation of FARA is not the courage of one's convictions but the courage to use materials officially censured by the government." 619 F. Supp., at 1124–1125.

An obvious flaw in this reasoning is that the materials that satisfy the definition of "political propaganda" are not "materials officially censured by the government." The statutory term is a neutral one, and in any event, the Department of Justice makes no public announcement that the materials are "political propaganda."

find this argument unpersuasive, indeed, untenable, for three reasons.

First, the term "political propaganda" does nothing to place regulated expressive materials "beyond the pale of legitimate discourse." *Ibid.* Unlike the scheme in *Lamont* v. *Postmaster General,* the Act places no burden on protected expression. We invalidated the statute in *Lamont* as interfering with the addressee's First Amendment rights because it required "an official act (viz., returning the reply card) as a limitation on the unfettered exercise of the addressee's First Amendment rights." 381 U. S., at 305. The physical detention of the materials, not their mere designation as "communist political propaganda," was the offending element of the statutory scheme. The Act "se[t] administrative officials astride the flow of mail to inspect it, appraise it, write the addressee about it, and await a response before dispatching the mail." *Id.,* at 306. The Act in this case, on the other hand, does not pose any obstacle to appellee's access to the materials he wishes to exhibit. Congress did not prohibit, edit, or restrain the distribution of advocacy materials in an ostensible effort to protect the public from conversion, confusion, or deceit.

To the contrary, Congress simply required the disseminators of such material to make additional disclosures that would better enable the public to evaluate the import of the propaganda.[15] The statute does not prohibit appellee from

---

[15] "What emerged from extended Congressional investigations, hearings and deliberations was this Act, intended to provide an appropriate method to obtain information essential for the proper evaluation of political propaganda emanating from hired agents of foreign countries. As the House and Senate Committees considering the Bill said, it 'does not in any way impair the right of freedom of speech, or of a free press, or other constitutional rights.' Resting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false, the bill is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source. Such legislation

advising his audience that the films have not been officially censured in any way. Disseminators of propaganda may go beyond the disclosures required by statute and add any further information they think germane to the public's viewing of the materials. By compelling some disclosure of information and permitting more, the Act's approach recognizes that the best remedy for misleading or inaccurate speech contained within materials subject to the Act is fair, truthful, and accurate speech. See generally *Whitney* v. *California*, 274 U. S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence"). The prospective viewers of the three films at issue may harbor an unreasoning prejudice against arguments that have been identified as the "political propaganda" of foreign principals and their agents, but the Act allows appellee to combat any such bias simply by explaining—before, during, or after the film, or in a wholly separate context—that Canada's interest in the consequences of nuclear war and acid rain does not necessarily undermine the integrity or the persuasiveness of its advocacy.

Ironically, it is the injunction entered by the District Court that withholds information from the public. The suppressed information is the fact that the films fall within the category of materials that Congress has judged to be "political propaganda." A similar paternalistic strategy of protecting the public from information was followed by the Virginia Assembly, which enacted a ban on the advertising of prescription drug prices by pharmacists. See *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976). The State sought to justify the ban as a means of

---

implements rather than detracts from the prized freedoms guaranteed by the First Amendment. No strained interpretation should frustrate its essential purpose." *Viereck* v. *United States*, 318 U. S. 236, 251 (1943) (Black, J., dissenting).

preventing "the aggressive price competition that will result from unlimited advertising" and the "loss of stable pharmacist-customer relationships" that would result from comparison shopping on the basis of price. We wholly rejected these justifications, finding that the ban was predicated upon assumptions about the reactions the public would have if they obtained the "wrong" kind of information. Although the proscribed information in that case was price advertising of pharmacy items, our rationale applies equally to information that the Congress considers certain expressive materials to be "propaganda":

> "[O]n close inspection it is seen that the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance. The advertising ban does not directly affect professional standards one way or the other. It affects them only through the reactions it is assumed people will have to the free flow of drug price information." *Id.*, at 769.

Likewise, despite the absence of any direct abridgment of speech, the District Court in this case assumed that the reactions of the public to the label "political propaganda" would be such that the label would interfere with freedom of speech. In *Virginia Pharmacy Bd.*, we squarely held that a zeal to protect the public from "too much information" could not withstand First Amendment scrutiny:

> "There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. . . . It is precisely this kind of choice, between the dangers of suppressing information, and the dangers from its misuse if it is freely available, that the First Amendment makes for us." *Id.*, at 770.

See also *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 96–97 (1977).

Second, the reasoning of the District Court is contradicted by history. The statutory definition of "political propaganda" has been on the books for over four decades.[16] We should presume that the people who have a sufficient understanding of the law to know that the term "political propaganda" is used to describe the regulated category also know that the definition is a broad, neutral one rather than a pejorative one.[17] Given this long history, it seems obvious that if the fear of misunderstanding had actually interfered with

---

[16] The Act as adopted in 1938 did not use the term "political propaganda." In 1942 the Act was amended to add the term and to require that materials meeting the definition of "political propaganda" be labeled with an identification statement and a copy provided to the Attorney General. Act of Apr. 29, 1942, ch. 263, §§ 1, 4, 56 Stat. 248, 255, 22 U. S. C. §§ 611, 614. The statute states that the policy and purpose of the Act are to require "public disclosure by persons engaging in propaganda activities and other activities for or on behalf of . . . foreign principals so that the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in the light of their associations and activities." 22 U. S. C. § 611 note (Policy and Purpose). The House Report stated, "[T]hese amendments do not change the fundamental approach of the statute, which is one not of suppression or of censorship, but of publicity and disclosure." H. R. Rep. No. 1547, 77th Cong., 1st Sess., 2, 4 (1941). When Congress again amended the Act in 1966, it retained the expression "political propaganda" to describe the materials subject to the requirements of the Act.

[17] The Chief of the Registration Unit, Internal Security Section, Criminal Division of the Department of Justice, submitted a nonexhaustive list of films reported by agents under § 4 of the Act. The film titles support the conclusion that the Act's definition of "propaganda" is indeed a neutrally applied one which includes allies as well as adversaries of the United States. The titles and their foreign principals include, Berlin Means Business and More (Berlin Economic Development Corporation); Hong Kong Style (Government of Hong Kong); A Conversation with Golda Meir (Consulate General of Israel); and Ballad of a Soldier (Sovexportfilm). A television videotape entitled What is Japan Doing About Energy? (the Government of Japan) is also included in the list. Second Declaration of Joseph E. Clarkson, Exhibit B, App. 60–63.

the exhibition of a significant number of foreign-made films, that effect would be disclosed in the record. Although the unrebutted predictions about the potentially adverse consequences of exhibiting these films are sufficient to support appellee's standing, they fall far short of proving that the public's perceptions about the word "propaganda" have actually had any adverse impact on the distribution of foreign advocacy materials subject to the statutory scheme. There is a risk that a partially informed audience might believe that a film that must be registered with the Department of Justice is suspect, but there is no evidence that this suspicion—to the degree it exists—has had the effect of Government censorship.

Third, Congress' use of the term "political propaganda" does not lead us to suspend the respect we normally owe to the Legislature's power to define the terms that it uses in legislation. We have no occasion here to decide the permissible scope of Congress' "right to speak";[18] we simply view this particular choice of language, statutorily defined in a neutral and evenhanded manner, as one that no constitutional provision prohibits the Congress from making. Nor do we agree with the District Court's assertion that Congress' use of the term "political propaganda" was "a wholly gratuitous step designed to express the suspicion with which Congress regarded the materials." 619 F. Supp., at 1125. It is axiomatic that the statutory definition of the term excludes unstated meanings of that term. *Colautti* v. *Franklin*, 439 U. S. 379, 392, and n. 10 (1979). Congress' use of the term "propaganda" in this statute, as indeed in other legislation, has no pejorative connotation.[19] As judges it is our duty to

---

[18] The implications of judicial parsing of statutory language to determine if Congress' word choices violate the First Amendment are discussed in *Block* v. *Meese*, 253 U. S. App. D. C., at 327–328, 793 F. 2d, at 1313–1314.

[19] See, *e. g.*, 26 U. S. C. § 501(c)(3) (excluding from the charitable deduction those charitable organizations whose activities include in substantial part "carrying on propaganda, or otherwise attempting, to influence legis-

construe legislation as it is written, not as it might be read by a layman, or as it might be understood by someone who has not even read it. If the term "political propaganda" is construed consistently with the neutral definition contained in the text of the statute itself, the constitutional concerns voiced by the District Court completely disappear.

The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA took no part in the consideration or decision of this case.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting in part.

The Court, in this case today, fails to apply the long-established "principle that the freedoms of expression must be ringed about with adequate bulwarks." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 66 (1963). While I agree with the Court's conclusion that appellee has standing, I do not agree that the designation "political propaganda," imposed by the Department of Justice on three films from Canada about acid rain and nuclear war, pursuant to the Foreign

---

lation"); 36 U. S. C. § 1304(a) (no substantial part of the activities of United Services Organizations "shall involve carrying on propaganda, or otherwise attempting to influence legislation"); 5 U. S. C. § 4107(b)(1) (agency may not train employee by, in, or through a non-Government facility a substantial part of the activities of which is "carrying on propaganda, or otherwise attempting, to influence legislation").

Like "propaganda," the word "lobbying" has negative connotations. See The New Columbia Encyclopedia 1598 (1975) ("The potential for corruption . . . has given lobbying an unsavory connotation"). Although the Federal Regulation of Lobbying Act, 2 U. S. C. §§ 261–270, uses this semantically slanted word, we are not aware of any suggestion that these negative connotations violate the First Amendment. See *United States* v. *Harriss,* 347 U. S. 612 (1954) (construing and upholding constitutionality of statute's registration and reporting requirements).

Agents Registration Act (Act), 52 Stat. 631, as amended, 22 U. S. C. §§ 611–621, presents no obstacle to expression protected by the First Amendment.

I

The Court's decision rests upon its conclusion that the term "political propaganda" is neutral and without negative connotation. It reaches this conclusion by limiting its examination to the statutory definition of the term and by ignoring the realities of public reaction to the designation. But even given that confined view of its inquiry, it is difficult to understand how a statutory categorization which includes communication that "instigates . . . civil riot . . . or the overthrow of . . . government . . . by any means involving the use of force or violence," § 611(j)(2), can be regarded as wholly neutral. Indeed, the legislative history of the Act indicates that Congress fully intended to discourage communications by foreign agents.

The Act grew out of the investigations of the House Un-American Activities Committee, formed in 1934 to investigate Nazi propaganda activities in the United States and the dissemination of subversive propaganda controlled by foreign countries attacking the American form of government. See H. R. Res. 198, 73d Cong., 2d Sess. (1934), 78 Cong. Rec. 13–14 (1934).[1] The Act mandated disclosure, not direct cen-

---

[1] One of the countermeasures the Committee recommended in light of the danger posed by foreign propaganda was that all propaganda agents who represented any foreign government or foreign political party be required to register with the Secretary of State. H. R. Rep. No. 153, 74th Cong., 1st Sess., 23 (1935). This requirement became the centerpiece of the Act, which was motivated by concern with the "many persons in the United States representing foreign governments or foreign political groups, who are supplied by such foreign agencies with funds and other materials to foster un-American activities, and to influence the external and internal policies of this country, thereby violating both the letter and the spirit of international law, as well as the democratic basis of our own American institutions of government." H. R. Rep. No. 1381, 75th Cong., 1st Sess., 1–2 (1937).

sorship, but the underlying goal was to control the spread of propaganda by foreign agents. This goal was stated unambiguously by the House Committee on the Judiciary: "We believe that the spotlight of pitiless publicity will serve as a deterrent to the spread of pernicious propaganda." H. R. Rep. No. 1381, 75th Cong., 1st Sess., 2 (1937).

In 1942, Congress revised the Act, 56 Stat. 248, ch. 263, at the request of the Department of Justice in order to strengthen the Government's "chief instrument . . . for controlling foreign agent activity in the theater of political propaganda." Hearings on H. R. 6045 before Subcommittee No. 4 of the House Committee on the Judiciary, 77th Cong., 1st Sess., Ser. No. 9, p. 24 (1941) (1941 Hearings) (statement of Lawrence M. C. Smith, Chief, Special Defense Unit, Department of Justice). The amendments included the definition of propaganda in addition to labeling and reporting requirements virtually identical to those imposed under the current version of the Act. The Department of Justice explained that it sought to counter secret propaganda efforts "[i]n view of the increased attempts by foreign agents at the systematic manipulation of mass attitudes on national and international questions, by adding requirements to keep our Government and people informed of the nature, source, and extent of political propaganda distributed in the United States." Id., at 25. And, as in the original Act, the amended version furthered Congress' desire to disable certain types of speech by the use of disclosure requirements designed to bring about that result.[2]

The meaning of "political propaganda" has not changed in the 45 years since Congress selected those two words. While the Act is currently applied primarily to foreign policy

---

[2] See, e. g., 1941 Hearings 20 (statement of Lawrence M. C. Smith) ("And . . . as Justice Holmes has said, champagne that is put in the light and left in the light goes flat, and that is the way we have found it to be, that these bad political organizations cannot survive in the pitiless light of publicity").

advocacy, the designation it employs continues to reflect the original purposes of the Act and continues to carry its original connotations. For example, a Department of Justice representative recently recognized:

"[I]t is fair to say that the original act reflected a perceived close connection between political propaganda and subversion. It is this original focus . . . and therefore the pejorative connotations of the phrases 'foreign agent' and 'political propaganda' which has caused such misunderstanding over the years." Oversight Hearing before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 98th Cong., 1st Sess., 3 (1983) (testimony of D. Lowell Jensen, Assistant Attorney General, Criminal Division, Department of Justice).

Even if Congress had enacted the "propaganda" designation at issue here with a completely neutral purpose, that would not be sufficient for the First Amendment inquiry, for the Court has "long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment." *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 592 (1983). The Court today, however, fails to undertake this inquiry. It concludes that the statutory definition of "political propaganda" is a "neutral one," *ante*, at 479, n. 14, and dismisses the District Court's holding as resting on a "potential misunderstanding of [the statute's] effect," *ante*, at 478.

A definition chosen by Congress is controlling as to the scope of the statute, but the Court has never held that Congress' choice of a definition precludes an independent determination of a statute's constitutionality based upon its *actual* effect. See *FEC* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 255 (1986) (plurality opinion) ("The fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize [it] as an infringement

on First Amendment activities"). In *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965), the "communist political propaganda" that was detained by the Postmaster and delivered only upon the addressee's request was defined by reference to the same "neutral" definition of "political propaganda" in the Act that is at issue here. *Id.,* at 302–303. Yet the Court examined the effects of the statutory requirements and had no trouble concluding that the need to request delivery of mail classified as "communist political propaganda" was "almost certain to have a deterrent effect" upon debate. *Id.,* at 307. The reason was certainly the disapprobation conveyed by the classification:

> "Public officials, like schoolteachers who have no tenure, might think they would invite disaster if they read what the Federal Government says contains the seeds of treason. Apart from them, any addressee is likely to feel some inhibition in sending for literature which federal officials have condemned as 'communist political propaganda.'" *Ibid.*

I do not see why the analysis here should be any different, or why the statutory definition should be given any greater weight, in the case of the elected public official who wishes to exhibit films that the Federal Government has categorized as "political propaganda."

I can conclude only that the Court has asked, and has answered, the wrong question. Appellee does not argue that his speech is deterred by the statutory definition of "propaganda." He argues, instead, that his speech is deterred by the common perception that material so classified is unreliable and not to be trusted, bolstered by the added weight and authority accorded any classification made by the all-pervasive Federal Government. Even if the statutory definition is neutral, it is the common understanding of the Government's action that determines the effect on discourse protected by the First Amendment.

We need not speculate as to the common reaction to the term "propaganda," or rely only on the Court's assessment in *Lamont* v. *Postmaster General, supra,* of the negative connotations it raises. Appellee has submitted testimony of an expert in the study of propaganda, unrebutted by appellants. According to the declaration of Leonard W. Doob, Sterling Professor Emeritus of Psychology at Yale University: "[T]he designation 'political propaganda' of a film or book by the government is pejorative, denigrating to the material, and stigmatizing to those disseminating it. . . . [A]s the history of the last seventy years suggests, to call something propaganda is to assert that it communicates hidden or deceitful ideas; that concealed interests are involved; that unfair or insidious methods or *[sic]* being employed; that its dissemination is systematic and organized in some way." App. 101. See also *ante,* at 474, n. 8. It simply strains credulity for the Court to assert that "propaganda" is a neutral classification.

## II

Because the Court believes that the term "political propaganda" is neutral, it concludes that "the Act places no burden on protected expression." *Ante,* at 480. The Court's error on neutrality leads it to ignore the practical effects of the classification, which create an indirect burden on expression. As a result, the Court takes an unjustifiably narrow view of the sort of government action that can violate First Amendment protections. Because Congress did "not pose any obstacle to appellee's access to the materials he wishes to exhibit" in that it "did not prohibit, edit, or restrain the distribution of advocacy materials," *ibid.,* the Court thinks that the propaganda classification does not burden speech. But there need not be a direct restriction of speech in order to have a First Amendment violation. The Court has recognized that indirect discouragements are fully capable of a coercive effect on speech, *American Communications Assn.* v. *Douds,* 339 U. S. 382, 402 (1950), and that the First

Amendment protections extend beyond the blatant censorship the Court finds lacking here. "[T]he fact that no direct restraint or punishment is imposed upon speech . . . does not determine the free speech question." *Ibid.*

In *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58 (1963), for example, the Court struck down a Rhode Island statute authorizing a commission to designate morally objectionable material. The Court rejected the State's argument that the First Amendment was not violated because the Commission did not "regulate or suppress obscenity," *id.,* at 66, finding that through the use of *informal sanctions,* "the Commission deliberately set out to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim," *id.,* at 67. There likewise was no overt restraint on speech in *Lamont.* The Postmaster General argued there that because an addressee had only to return a card in order to receive the publication, "only inconvenience and not an abridgment is involved." 381 U. S., at 309 (concurring opinion). But, as was stated there, "inhibition as well as prohibition against the exercise of precious First Amendment rights is a power denied to government." *Ibid.*[3]

By ignoring the practical effect of the Act's classification scheme, the Court unfortunately permits Congress to accomplish by indirect means what it could not impose directly—a restriction of appellee's political speech. Political discourse is burdened by the Act because Congress' classification scheme inhibits dissemination of classified films. In deciding whether or not to show a film, individuals and institutions are

---

[3] See also *Freedman* v. *Maryland,* 380 U. S. 51, 59 (1965) (film censorship program unconstitutional in the absence of procedural safeguards because otherwise, as a practical matter, "it may prove too burdensome to seek review of the censor's determination"); *Speiser* v. *Randall,* 357 U. S. 513, 526 (1958) (state program placing burden on taxpayers to prove they did not advocate overthrow of United States declared unconstitutional because "[i]n practical operation . . . this procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free").

bound to calculate the risk of being associated with materials officially classified as propaganda. Many, such as appellee, reasonably will decline to assume the necessary risk. That risk is particularly high for those who are accountable to the public, among them librarians and elected officials, to cite obvious examples. In addition, the official designation taints the message of a classified film by lessening its credence with viewers. For the film to carry its full force and meaning an exhibitor must attempt to dispel skepticism flowing from the notion that the film is laced with lies and distortions. These burdens are too great and too real in practical terms to be ignored simply because they are imposed by way of public reaction rather than through a direct restriction on speech.

The Court perceives no burden on First Amendment rights, because "Congress simply required the disseminators of [propaganda] material to make additional disclosures that would better enable the public to evaluate the import of the propaganda." *Ante*, at 480. Yet in its discussion of standing, the majority recognizes that the practical effect of the "disclosure" is to place a film exhibitor on the defensive, for this "disclosure" would require the exhibitor to take affirmative steps to avoid harm to his or her reputation. *Ante*, at 475. Moreover, disclosure requirements are not inherently consistent with the First Amendment and do not necessarily serve to advance discourse. The Court often has struck down disclosure requirements that threatened to have a "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association." *Gibson* v. *Florida Legislative Investigation Comm.*, 372 U. S. 539, 557 (1963); see also, *Brown* v. *Socialist Workers '74 Campaign Comm.*, 459 U. S. 87, 100 (1982) (names of campaign contributors and recipients of funds); *Talley* v. *California*, 362 U. S. 60 (1960) (identification of names and addresses of authors of handbills); *N. A. A. C. P.* v. *Alabama*, 357 U. S. 449, 462 (1958) (membership lists).

The Court likens the injunction issued by the District Court to the state ban on advertising prices of prescription drugs struck down in *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976). *Ante*, at 481–482. But there is a significant difference between the "paternalistic strategy of protecting the public from information," *ante*, at 481, by way of a *ban* on information and a prohibition of the Government disparagement at issue in this case. A ban on advertising does indeed "enforc[e] silence," in the words of Justice Brandeis. *Whitney* v. *California*, 274 U. S. 357, 377 (1927) (concurring opinion). But the District Court's holding here—that a derogatory classification impermissibly inhibits protected expression—did not impose a ban; it merely lifted a disclosure requirement, as in the other cases cited above. Under the District Court's ruling, opponents of the viewpoint expressed by the National Film Board of Canada remained completely free to point out the foreign source of the films. The difference was that dialogue on the value of the films and the viewpoints they express could occur in an atmosphere free of the constraint imposed by Government condemnation. It is the Government's classification of those films as "political propaganda" that is paternalistic. For that Government action does more than simply provide additional information. It places the power of the Federal Government, with its authority, presumed neutrality, and assumed access to all the facts, behind an appellation *designed* to reduce the effectiveness of the speech in the eyes of the public.

## III

Appellants have not even attempted to articulate any justification for saddling the expression of would-be film exhibitors with the classification "political propaganda." Yet this Court has held consistently that a limitation on First Amendment freedoms can be justified only by a compelling governmental interest. *FEC* v. *Massachusetts Citizens for Life,*

*Inc.*, 479 U. S., at 256; *NAACP* v. *Button*, 371 U. S. 415, 438 (1963). The asserted purpose of the Act's classification scheme is "so that the Government and the people of the United States may be informed of the identity of such persons and may appraise their statements and actions in the light of their associations and activities." 56 Stat. 249. But this goal has been rendered incapable of justifying even the slightest burden on speech, for appellants interpret the Act in a way that nullifies its effectiveness as a disclosure mechanism.

There are two ways in which the purpose of the Act to inform the public is fulfilled. First, the Act requires films transmitted by foreign agents to be "conspicuously marked" with the name and address of the agent and the foreign principal, and, second, the Act requires dissemination reports for the film and the agent's registration statement to be placed on file with the Department of Justice, available for public inspection. §§ 614(a), (b), (c), and 616(a); see *ante*, at 470, and nn. 5 and 6.[4] The public is able to learn of its opportunity to examine these files by reading the label affixed to the film. See *ante*, at 471.[5]

---

[4] The statutory requirement that a foreign agent submit two copies of the material it distributes, § 614(a), is relaxed for motion pictures. Two copies need not be filed so long as the agent files dissemination reports monthly and submits either a filmstrip showing the required labeling on the film or an affidavit "certifying that the required label has been made a part of the film." 28 CFR § 5.400(c) (1986). Dissemination reports require a description of the propaganda material, the number of copies transmitted, the dates and means of transmission, and the number of each type of recipient: libraries, public officials, newspapers, etc. For films, the report must also list the "name of [the] station, organization, or theater using," the dates it was shown, and the estimated audience. App. 17. A person who willfully violates the registration or filing requirements is subject to a fine of up to $10,000 and/or imprisonment for not more than five years. § 618(a)(2).

[5] Failure to comply with the labeling requirement is punishable by a fine of not more than $5,000 and/or imprisonment for not more than six months. *Ibid.*

The purposes of the Act could be fulfilled by such a process without categorizing the films as "political propaganda." But the importance of conveying any of this information to the public is belied by the Government's position that the informative label can be removed by appellee. See Declaration of Joseph E. Clarkson, Chief, Registration Unit, Internal Security Section, Criminal Division, Department of Justice. App. 22. After the complaint in this case (which included a challenge to the labeling requirement) was filed in the District Court, the Department of Justice asserted that it "has never construed the Act to apply to a person in [appellee's] position, and thus has not, does not, and will not require [appellee] to attach the neutral statutory disclaimer to, or exhibit the disclaimer on said films if he obtains them." *Ibid.* The only reasonable interpretation of this statement is that any exhibitor would be "a person in [appellee's] position" and thus exempt from the labeling requirements. But if the labeling requirements apply to the foreign agent only, and can be removed by recipients of the film, the information will never reach the public, its intended audience. This nullification of the primary purpose of the statute means that the classification of the films as "political propaganda" places a purely gratuitous burden on a would-be exhibitor and serves no governmental interest at all, let alone a compelling one.

Even if appellants could assert a compelling interest, the propaganda classification carries a derogatory meaning that is unnecessary to the asserted purpose of the Act. The Department of Justice admitted as much in a letter regarding proposed changes in the legislation:

> "We believe Congress should . . . consider replacing the broad definition of 'political propaganda,' which currently defines materials that must be labelled, with a more concise definition, more narrowly focused on the United States political process. We would also support the use of a more neutral term like political 'advocacy' or 'information' to denominate information that must be

labelled." Letter, dated August 8, 1983, to the Honorable Robert W. Kastenmeier, Chairman, Subcommittee on Courts, Civil Liberties and the Administration of Justice, of the House Committee on the Judiciary, from Edward C. Schmults, Deputy Attorney General, Department of Justice. App. 118.[6]

Given that position, the Court errs in tolerating even the slightest infringement of First Amendment rights by governmental use of a classification deemed unnecessary by those who enforce it. I respectfully dissent.

---

[6] The Justice Department also has favored altering the disclosure statement. In the same letter, Deputy Attorney General Schmults said: "We would . . . favor amending the Act to permit use of simpler and more neutral language in the disclosure label, to avoid unnecessary negative connotations that may be inferred from the disclosure statement (as, for instance, from the current statement that the United States Government has not approved the contents of the message)."