ADVANCED MANAGEMENT
TECHNOLOGY, INC.,
Petitioner,

v.

FEDERAL AVIATION ADMINISTRA-
TION and Jane F. Garvey, Adminis-
trator, Federal Aviation Administra-
tion, Respondents.

No. 99–1314.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 6, 2000.

Decided May 12, 2000.

Efrem M. Grail argued the cause for petitioner. With him on the briefs was L. James D'Agostino. Leigh T. Hansson entered an appearance.

Christine N. Kohl, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were David W. Ogden, Acting Assistant Attorney General, and Anthony J. Steinmeyer, Attorney.

Before: SILBERMAN, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

In 1998 the Federal Aviation Administration ("FAA") adopted a subordinate office's findings that petitioner Advanced Management Technology, Inc. ("AMTI") had made misrepresentations in a bid proceeding in which AMTI eventually won a multi-million dollar contract. Because of the misrepresentations, the bidding was reopened. But because the FAA believed AMTI had not intended to defraud the government, it allowed AMTI to compete in the new round—in which AMTI again won the contract. AMTI has no desire to relinquish the new contract in favor of the old one, but still seeks a reversal of the earlier findings or a new hearing with different procedures. We dismiss the petition for want of standing.

\* \* \*

In August 1996 the FAA began procurement of a technical assistance contract for work with the Global Positioning System. A group of contractors, bound by a May 1996 "teaming agreement" and including AMTI, responded. Fellow teammates were Innovative Solutions International ("ISI") and Overlook Systems Technologies, Inc. ("Overlook"). Overlook was "team leader." Over the next year and a half, AMTI's teammates fluctuated in number and identity. In January 1998 the FAA issued its Request for Offers. AMTI, now the team leader of a reconstituted group, submitted a proposal under which it would serve as the prime contractor and Overlook would be one of three subcontractors.

AMTI represented in its offer that it had "entered into teaming Agreements with Overlook, ISI, and Zeta that establish goals for each subcontractor's participation in work efforts on [the contract]." The agreement referred to was the May 1996 agreement, not a new one. AMTI further offered a chart with proposed work allocation percentages among the subcontractors, including Overlook, and identified key personnel from Overlook whose services would be used. The FAA found AMTI's proposal the best value. It nonetheless negotiated with AMTI further in a quest for better terms. On May 8, 1998 AMTI submitted its "best and final offer," known in the trade as a BAFO. This offer as-

sured FAA that there were no material changes in personnel availability (i.e., it implicitly assured the FAA that key Overlook personnel would be used), and also warranted that it had successfully negotiated revised rates with subcontractors.

AMTI failed to mention that on April 16 Overlook had provided AMTI *its* best and final offer with respect to Overlook's labor rates—an offer quite inconsistent with AMTI's May 8 offer to the FAA. Whereas Overlook had offered to participate at a specified compensation rate on condition that it receive "approximately 33 percent" of the contract, AMTI's offer included Overlook's staffing at that compensation rate but at less than half the usage rate on which Overlook had conditioned its agreement. AMTI's counsel would later attempt to justify this fact to the FAA's Office of Dispute Resolution for Acquisition ("Dispute Resolution Office") as follows:

> [B]ecause AMTI is a small, minority, woman-owned business, it quite simply could not afford to just cover the additional expense of the Overlook personnel. . . . Overlook refused to lower the rates for its staff and thus, AMTI was forced to make a business decision: AMTI could bid all [SEALED] of Overlook's people at the [SEALED] multiplier and lose the contract, or AMTI could cut the number of Overlook's positions, and bid them at the higher rates. AMTI could not discuss this with Overlook, however, because no one at Overlook was available to make the decision.

On June 2, 1998 the FAA awarded AMTI the contract. Negotiations with Overlook continued, ultimately breaking down on June 29 with Overlook's withdrawal from the project. Meanwhile, competing bidders Camber Corporation and Information Systems & Networks Corporation filed bid protests, alleging among other things "bait and switch"—that AMTI had misrepresented the availability of key personnel. Apparently the bid protests were fueled in no small part with inside information from Overlook. FAA referred the protests to its Dispute Resolution Office.

The FAA eventually adopted the findings of that office, concluding that "the use AMTI made of Overlook's April 16, 1998 rates and its highly qualified key personnel was completely unauthorized. AMTI proceeded to use those rates and personnel with no assurance that, once Overlook discovered what AMTI had done, Overlook would still make those critical individuals available[.]" *Protests of Camber Corporation and Information Systems & Networks Corporation Under Solicitation No. DTFA01–[96]–R–11087*, Docket Nos. 98–ODRA–00079 et al., at 36 (Sept. 3, 1998). The FAA then ordered the bid process reopened. AMTI was allowed to continue performing under the original contract in the interim. It was also allowed to recompete for the contract, as the FAA found no "actual intent to defraud the Government." *Id.* at 77. The FAA denied AMTI's motion for reconsideration, and AMTI petitioned for review here.

In the meantime, AMTI re-bid and won the contract. In fact, the second award was more lucrative than the first. AMTI nonetheless argues that it was the victim of findings unsupported by substantial evidence and contrary to law, and that it was subjected to a dispute resolution procedure (the hearing before the Dispute Resolution Office) which violated statutory authority[1] and constitutional due process. But AMTI does not ask us to restore the first contract. Rather, it seeks mere reversal of the FAA's findings, or in the alternative a remand to the FAA for a hearing that satisfies statutory and constitutional standards.

\* \* \*

The FAA challenges AMTI's standing, arguing that because AMTI is cur-

---

1. The authority at issue is § 348 of the Department of Transportation and Related Agencies Appropriations Act, 1996, Pub.L. No. 104–50, 109 Stat. 460 (1995).

rently performing under a more lucrative contract, it can't really be injured. The claim may sound like one of mootness—a justiciable controversy existed but no longer remains—but the timing makes AMTI's problem one of standing. AMTI was awarded the second contract on June 24, 1999, before either the FAA's denial of reconsideration or AMTI's filing the present petition for review (July 30, 1999). Standing is assessed "at the time the action commences," *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* —— U.S. ——, 120 S.Ct. 693, 709–10, 145 L.Ed.2d 610 (2000), i.e., in this case, at the time AMTI sought relief from an Article III court, when AMTI held the more lucrative second contract.

Contrary to AMTI's assumptions, Article III courts do not ordinarily have jurisdiction to issue, as the Seventh Circuit has put it, "Writs of Erasure" to administrative agencies or district courts to cleanse their opinions of material distressing to winners. *United States v. Accra Pac, Inc.,* 173 F.3d 630, 632 (7th Cir. 1999). AMTI "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth,* —— U.S. at ——, 120 S.Ct. at 704. AMTI claims reputational injury, monetary injury from the costs of litigation and rebidding, and injury to its right to a legally valid procurement process.

## 1. Reputational Injury

AMTI says the FAA branded it a "fraud" and a "liar." With this (mis)characterization of the FAA's findings, AMTI seeks to bring itself within the reach of reputational injury cases such as *Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). See also *Joint Anti–Fascist Refugee Committee v. McGrath,*

341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); *Southern Mutual Help Ass'n, Inc. v. Califano,* 574 F.2d 518 (D.C.Cir.1977) (*"SMHA"*); *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980).

Standing cannot be "inferred argumentatively" but rather "must affirmatively appear in the record." *Spencer v. Kemna,* 523 U.S. 1, 10–11, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (internal quotations omitted). All that affirmatively appears here is AMTI's vast exaggeration of the FAA's findings; we have no allegations, much less evidence, as to their present or future consequences. The FAA specifically declined to find any intent to defraud; a "bait and switch" finding can be made solely on negligent misrepresentations. AMTI notes that the October 5, 1998 issue of *Federal Contracts Reports,* which relayed the FAA's decision to the field, quoted a remark of counsel for the Camber Corporation that the order "vindicates the basic principle that you can't lie to the government to get a contract." But the government as adjudicator can hardly be held responsible for the gloatings of a triumphant advocate. AMTI offered no evidence that the FAA's findings cast any shadow over its business activities, and the "all is forgiven" message implicit in FAA's re-award of the contract suggests the improbability of such a shadow.

With this sparse record, we need not probe the subtle boundaries of precedent. In *Meese v. Keene,* for instance, the Court found on the basis of survey data and expert affidavits that if plaintiff were to exhibit certain imported films under the government's mandatory label of "political propaganda," "his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired." 481 U.S. at 473–74, 107 S.Ct. 1862 (internal quotation marks omitted). In *SMHA* a grantor agency had prematurely terminated plaintiff grantee's multi-year grant, accompanying the termination with a scath-

ing audit. Though the termination itself—which we found required a hearing under the agency's regulations—was surely enough, we stressed the severity of the agency's condemnation of plaintiff and the overwhelming probability that future applications would receive an "inhospitable reception." 574 F.2d at 524. *Old Dominion Dairy Products* similarly involved devastating findings with present and future preclusion from Government work. 631 F.2d at 955, 964. Cf. *Kartseva v. Department of State*, 37 F.3d 1524, 1528 (D.C.Cir. 1994) (reviewing due process merits issue when government may have "automatically" precluded plaintiff from future jobs).

AMTI has not begun to show the likelihood of injury from the FAA's characterizations of its conduct. Charitably, the injury is "speculative"—the ultimate label for injuries too implausible to support standing. See *Alamo v. Clay*, 137 F.3d 1366, 1370 (D.C.Cir.1998); *J. Roderick MacArthur Foundation v. FBI*, 102 F.3d 600, 606 (D.C.Cir.1996). And reputational injury alone would not get AMTI very far in seeking a new hearing subject to constitutional due process. See *Siegert v. Gilley*, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ("Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation."). As we shall see, AMTI has nothing more.

2. Monetary Injury

█ AMTI asserts several different monetary injuries: litigation costs in the Dispute Resolution Office proceeding, costs of rebidding, and litigation costs in defending a qui tam lawsuit in the eastern district of Virginia allegedly spawned by the proceeding at FAA. AMTI has offered no detail for any of these costs,

which may well be more than offset by the award of the more lucrative second contract. But even *if* AMTI has concrete and particularized monetary injuries, and *if* they are fairly traceable to the FAA and its Dispute Resolution Office,[2] AMTI has only one theory of redressability: the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. According to AMTI, if we reverse the FAA, thereby making AMTI a "prevailing party" under EAJA, AMTI can recover some of its litigation expenses.

█ Under AMTI's theory anyone meeting EAJA's wealth limits would have constitutional standing (although often not prudential standing) in relation to any government decision: if they prevailed, they might recover attorneys' fees for reversing the agency's action. EAJA does not work this way. EAJA allows recovery of costs for prevailing parties in "judicial review of agency action," 28 U.S.C. § 2412(d)(1)(A), but the party must first prevail in a "court having jurisdiction of that action," *id.* In other words, there must be standing and otherwise proper subject matter jurisdiction for the *underlying* action; EAJA is not a highway to federal court for anyone wishing to uphold the rule of law. See *Democratic Senatorial Campaign Committee v. FEC*, 139 F.3d 951, 953 (D.C.Cir. 1998); *Lane v. United States*, 727 F.2d 18, 20–21 (1st Cir.1984). As the only means identified by AMTI for recovery of costs is a non-starter, this injury—assuming it exists at all on a net basis—is not redressable.

3. Right to a Legal Procurement Process

█ AMTI asserts finally that the FAA's creation and use of its Dispute Resolution Office deprives AMTI of its "right to a legally valid procurement process."

**2.** AMTI states that the "sole genesis" of the *qui tam* action was the Dispute Resolution Office's "finding of a fraudulent 'bait and switch.'" If so, this seems to mark the *qui tam* action as frivolous on its face since the False Claims Act bars actions solely "based upon" public disclosures in administrative hearings. See 31 U.S.C. § 3730(e)(4)(A); *United States ex rel. Findley v. FPC–Boron Employees' Club*, 105 F.3d 675 (D.C.Cir. 1997); *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347–48 (4th Cir.1994).

*National Maritime Union of America, AFL–CIO v. Commander, Military Sealift Command,* 824 F.2d 1228, 1237 (D.C.Cir. 1987). As a purely backward-looking claim, this adds nothing to the prior discussion. AMTI has identified no past injury that is within the power of the court to redress. Compare *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573 n. 8, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (allowing parties standing to enforce a procedural norm "designed to protect some threatened concrete interest").

As a forward-looking claim it fares no better. If AMTI had alleged that it expected to seek future FAA contracts and likely would re-encounter the offending procedure, that claim might provide it the necessary concrete interest in removing the alleged procedural flaw. In *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense,* 87 F.3d 1356, 1358–59 (D.C.Cir.1996), we found standing for a winning bidder—but only because it intended to bid on future similar contracts and raised legal claims against substantive rules that it thought were biased against its success. Not only does AMTI not mention future bidding plans, but the procedures to which it objects are ones triggered only by specified bidding disputes. AMTI does no more to show a likelihood of being subjected to these procedures than the plaintiff in *Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), showed a likelihood of being subjected to future chokeholds. See also *Spencer,* 523 U.S. at 15–16, 118 S.Ct. 978 (dismissing as "purely a matter of speculation" whether the petitioner would in the future appear as a civil or criminal witness and have his parole revocation used against him).

\* \* \*

The petition for review is *Dismissed.*