The TRAVELERS SOCIAL CLUB, Robert Johns, David Casinelli, Dean Ferrell and Walter M. Nelson, Jr., Plaintiffs,

v.

CITY OF PITTSBURGH; Pennsylvania State Police Bureau of Liquor Control Enforcement; Ronald M. Sharpe, Chief, Pittsburgh Police, Department; Kevin Mellott, Assistant Fire Chief for the City of Pittsburgh; Sam Cagney; Anthony Hildebrand; Victor Joseph; Robert Pires; Benjamin Sledge; Unknown Officers of the City of Pittsburgh Police Department; and Unknown Officers of the Pennsylvania State Police Bureau of Liquor Control Enforcement, Defendants.

Civ. A. No. 88–541.

United States District Court,
W.D. Pennsylvania.

May 5, 1988.

Michael L. Rosenfield, Jon Pushinsky, Pittsburgh, Pa., for plaintiffs.

George Spector, Pittsburgh, Pa., for the City of Pittsburgh.

Bryan Campbell, Pittsburgh, Pa., for the Pittsburgh Police Dept.

Kenneth J. Benson, Deputy Atty. Gen., Pittsburgh, Pa., for the State.

## OPINION

DIAMOND, District Judge.

This is an action under 42 U.S.C. § 1983 brought by The Travelers Social Club, a private non-profit club which possesses a liquor license and whose members are almost exclusively gay men and lesbians ("Club"); Robert Johns, the Club's steward; and three Club members, seeking declaratory and injunctive relief against various state and city law enforcement agencies as well as individuals associated with those agencies. Presently before the court is plaintiffs' request for preliminary injunctive relief. For the reasons set forth below, this request will be denied.

### Background

This action is based upon an inspection or "raid" of the Club by the various defendants on Valentine's Day, 1988, at approximately 5:00 A.M. The asserted purpose of the raid was to determine whether the Club was selling liquor to minors or selling liquor after hours in violation of the Pennsylvania Liquor Code, ("Liquor Code") 47 P.S. §§ 4-406 and 4-493(1) (1987).

The plaintiffs allege in their complaint, and sought to prove at the preliminary injunction hearing held before this court, that the various defendants violated plaintiffs' constitutional rights by engaging in assaultive and insultive behavior while conducting this raid. Plaintiffs also claim that they continue to be harmed because their fear of another similar raid has chilled their First Amendment right freely to associate at the Club and that the resulting dropoff in attendance at the Club since the

raid threatens the Club's viability. Plaintiffs seek a preliminary and permanent injunction enjoining and restraining the defendants from engaging in assaultive and insultive behavior when conducting raids in the future and a declaratory judgment stating that defendants' assaultive and insultive behavior on February 14, 1988, violated plaintiffs' constitutional rights.[1]

Before addressing the merits of the plaintiffs' claim for preliminary injunctive relief, however, the court must determine whether the plaintiffs have presented the court with a justiciable case or controversy. Specifically, because plaintiffs' claim for prospective relief is rooted in conduct which has occurred in the past, the court must determine whether the plaintiffs have standing to seek that form of relief based either on the harm that has already occurred, continuing harm, or the threat of future harm.

### Discussion

Article III of the Constitution requires that a plaintiff allege an actual case or controversy in order to invoke the jurisdiction of federal courts. *Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–1953, 20 L.Ed.2d 947 (1968). In the context of a plaintiff seeking injunctive relief, this case or controversy requirement has come to be analyzed in terms of whether a plaintiff has standing to seek that form of relief. The development and crystallization of this specific standing doctrine can be traced to a series of Supreme Court decisions beginning with *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and culminating with *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

In *O'Shea*, various county residents brought a civil rights class action against, among others, a magistrate and circuit judge alleging a pattern and practice of conduct regarding bond-setting, sentencing, and jury-fee practices in criminal cases

1. Plaintiffs initially sought in their complaint also to enjoin the defendants from entering the Club without a warrant; however, the plaintiffs have since modified this request upon learning through discovery and otherwise that the City Police conducted the February 14, 1988, raid pursuant to a search warrant and that the Pennsylvania Liquor Code permits warrantless searches by agents of the State Police Bureau of Liquor Control Enforcement.

which deprived the residents of their constitutional rights. 414 U.S. at 490–93, 94 S.Ct. at 673–74. The Supreme Court reversed the decision of the Court of Appeals upholding the granting of injunctive relief against these judicial officers because "the complaint failed to satisfy the threshold requirement imposed by Article III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy." *Id.* at 493, 94 S.Ct. at 675 (citations omitted).

The Court stated that "[p]laintiffs in the federal courts 'must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction....' Abstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct.... The injury or that threat of injury must be both 'real and immediate' not 'conjectural' or 'hypothetical.'" *Id.* at 493–94, 94 S.Ct. at 675 (citations omitted).

Specifically addressing claims for injunctive relief, the Court stated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects." *Id.* at 495–96, 94 S.Ct. at 676. The Court recognized that, "[o]f course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury. But here the prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before [the judicial officers]." *Id.* at 496, 94 S.Ct. at 676. The Court concluded that such a prospect would improperly take the Court into "the area of speculation and conjecture." *Id.*

In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), various individuals and organizations brought a class action under 42 U.S.C. § 1983 against the Mayor of Philadelphia, the Police Commissioner, and others alleging a pervasive pattern of illegal and unconstitutional mistreatment by police officers directed against minority citizens in particular and against all Philadelphia residents in general. 423 U.S. at 364–67, 96 S.Ct. at 601–02. The Court, after reiterating the *O'Shea* analysis discussed above, determined that the plaintiffs lacked standing to seek injunctive relief because their "claim to 'real and immediate' injury rests ... upon what one of a small, unnamed minority of policemen might do to them in the future...." *Id.* at 372, 96 S.Ct. at 605. The Court concluded that "[t]his hypothesis is even more attenuated than those allegations of future injury found insufficient in *O'Shea* to warrant invocation of federal jurisdiction." *Id.*

Likewise, in *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed. 2d 675 (1983), an individual brought suit against the City of Los Angeles and four of its policemen seeking damages, injunctive and declaratory relief under 42 U.S.C. § 1983. The complaint alleged that the plaintiff was stopped by the defendant officers for a traffic or vehicle code violation and that although he offered no resistance or threat whatsoever, the officers, without provocation or justification, seized him and applied a "chokehold"[2] rendering him unconscious and causing damage to his larynx. *Id.* at 97–98, 103 S.Ct. at 1663.

In addition to seeking damages, Lyons sought an injunction barring the use of chokeholds in the future when police officers are not threatened by the use of deadly force. *Id.* at 98, 103 S.Ct. at 1663. Lyons based his claim for injunctive relief on the fact that officers routinely apply the chokehold in situations where they are not threatened by the use of deadly force, that

---

**2.** Generally speaking, a "chokehold" was defined as a control procedure whereby a police officer, after placing one arm around the subject's neck, applied pressure with this arm to either the carotid arteries or the front of the subject's neck causing pain, diminished flow of air or oxygenated blood, and sometimes unconsciousness. *See Lyons,* 461 U.S. at 97 n. 1, 103 S.Ct. at 1663 n. 1.

many people have been injured as a result of the chokeholds, and that he had a justifiable fear that another contact with the Los Angeles police officers may result in his being choked and strangled to death without provocation or justification. *Id.*

The Court reviewed the relevant case law, including *O'Shea* and *Rizzo* and, after observing "that case-or-controversy considerations 'obviously shade into those determining whether the complaint states a sound basis for equitable relief,'" *id.* at 103, 103 S.Ct. at 1666 (citations omitted), analyzed whether Lyons had standing to seek injunctive relief against the City and the police officers. The Court stated:

No extension of *O'Shea* and *Rizzo* is necessary to hold that respondent Lyons has failed to demonstrate a case or controversy with the City that would justify the equitable relief sought. Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of chokeholds by police officers.... That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer who would illegally choke him into unconsciousness without any provocation or resistance on his part. The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties.

In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 105–06, 103 S.Ct. at 1667 (emphasis in original).

■ Thus, under *O'Shea* and its progeny, in order for a plaintiff to have standing to seek injunctive relief against law enforcement officials, a plaintiff must meet the dual requirements of showing: 1) that it is likely that they again will find themselves in the same or similar circumstances giving rise to the allegedly unconstitutional conduct; *and* 2) that it is likely that they again will be subjected to the allegedly unconstitutional conduct. For example, in *Lyons*, the plaintiff had to show that it was likely that he again would be stopped or arrested by the police *and* that he again would be improperly subjected to a chokehold. He could show neither.

■ In the present case, the plaintiffs must show that it is likely that they again will be raided by the defendants *and* that they again will be subjected to the allegedly assaultive and insultive behavior. Unlike the plaintiff in *Lyons*, the court believes that the plaintiffs in this case have met the first requirement. Specifically, the court finds that the existence of the Liquor Code which authorized the February 14, 1988, raid creates a sufficient likelihood that the Club and its patrons will be raided again. This finding is further supported by the testimony at the preliminary injunction hearing regarding the numerous prior raids of the Club. Unlike the plaintiff in *Lyons*, plaintiffs here need not act criminally nor be subjected to arbitrary police behavior before they are again confronted with law enforcement officials. Plaintiffs need not do anything other than maintain their liquor license in order to be again subjected to a raid. This is the equivalent of Lyons being able to show that it was likely that he again would be arrested or otherwise stopped by the police.

This does not end our inquiry, however, for the plaintiffs must also show that it is likely that their rights again will be violated when future raids are conducted. Al-

though there was much testimony regarding the alleged acts of police misconduct, there was a paucity of evidence introduced regarding the likelihood of its recurrence. Plaintiffs rely on the testimony of James Huggins, the Associate Director of Persad Center, a center for sexual minorities located in Pittsburgh, and an expert in counselling.

Mr. Huggins testified as to the existence of "homophobia" which he defined as an irrational fear, hatred or intolerance of homosexuals. He stated that it was akin to racial prejudice except that it is based upon sexual orientation instead of race. Mr. Huggins testified that homophobia can manifest itself through language and physical evidence. Regarding police violence toward homosexuals, Mr. Huggins pointed to studies which indicate that approximately one out of four gay men have experienced some sort of physical or verbal abuse by the police. He stated that the earlier testimony by plaintiffs' witnesses regarding the use of excessive force by the police and their use of derogatory language such as "faggots," "cocksuckers," and "queers," evidenced homophobia. Mr. Huggins then opined that if this testimony regarding abusive and insultive behavior was assumed to be true, and if the same police officers were to raid the Club again, it was likely that they would repeat this assaultive and insultive behavior. He based this opinion on his knowledge of why people change their behavior. Specifically, Mr. Huggins stated that unless the individual officers are punished in some way and shown that their behavior was inappropriate, they will repeat their behavior in the future.

█ For the following reasons, however, the court believes that this testimony is undermined by the other evidence introduced at the preliminary injunction hearing and concludes that it is insufficient to show the type of likelihood of recurrence mandated by *Lyons*.

First, Mr. Huggins' testimony flies in the face of the extensive testimony regarding the historically peaceful relationship between the Club and the State and City police, most of which was offered by plaintiffs' own witnesses. For example, in plaintiffs' efforts to satisfy the first requirement of *Lyons*—the likelihood of the Club being raided again—numerous witnesses, including the Club's steward, Robert Johns, testified that the Club had been raided numerous times in the past by agents of the Pennsylvania Liquor Control Board ("L.C.B."), who formerly had the authority to enforce the Liquor Code. But instead of describing the similarly violent and abusive nature of these earlier raids so as to show the likelihood of future violent raids, plaintiffs' witnesses emphasized the peaceful nature of these earlier raids. It appears that this was an attempt to show the unruliness of the law enforcement agents who are currently vested with the authority to enforce the Liquor Code— agents of the Pennsylvania State Police Bureau of Liquor Control Enforcement (State Police). However, later uncontroverted testimony established that all of the State Police officers located in the Pittsburgh area were formerly L.C.B. agents; some of whom actually participated in the earlier peaceful raids.

Similar testimony was offered regarding the relationship between the Club and City of Pittsburgh Police officers ("City Police"). The Club's steward, Robert Johns, testified that because the Club is located in a high crime area, he has had hundreds of dealings with City Police officers on matters dealing with the security of Club members. Mr. Johns testified that prior to February 14, 1988, he was always treated fairly by City Police officers. Indeed, he indicated that the police have grown to become sympathetic to Club members' needs for protection. He further testified that he has sought assistance from the City Police since February 14, 1988, without incident. He stated that he would continue to seek their assistance in the future.

Mr. Johns' testimony was supported by the testimony of another Club member, Joseph Musico. Mr. Musico, who occasionally acted as a sort of security guard for the Club by keeping watch from a radio-equipped van parked near the Club's front

entrance, testified that it was not unusual for City Police cars to come by the van and check to see whether everything was all right.

Plaintiffs attempt to distinguish uniformed City Police officers (with whom they have a positive relationship) from the plainclothes City Police officers whom they claim acted violently during the February 14, 1988, raid. This factual distinction, however, conflicts with uncontroverted evidence of record. For example, Officer Anthony Hildebrand, one of the plainclothes City Police officers accused of violent behavior, testified that he had been to the Club from twelve to twenty times prior to February 14, 1988, in response to requests from the Club. He stated that he had never had any problems on these prior visits and in fact had personally dealt with Mr. Johns on at least one occasion. Moreover, plaintiffs offered no testimony or evidence that plainclothes State or City Police officers had violated their constitutional rights in the past.

Even if the court accepts this factual distinction between uniformed and plainclothes City Police officers, however, plaintiffs are attempting to support the granting of a preliminary injunction based upon the unsanctioned actions of a few individual plainclothes police officers on a single occasion. These are the exact allegations found insufficient in *Rizzo* and *Lyons*.

Second, in addition to the historically peaceful relationship between the Club and the police, Mr. Huggins' opinion is undermined by the fact that it is based upon his assumption that the only punishment capable of preventing a recurrence of the alleged unconstitutional conduct is the granting of a preliminary injunction. Such an assumption is erroneous, however, because it ignores the real possibility that other sanctions, such as an award of damages against the individual officers, can have an equal or greater deterrent effect.

The court is also unpersuaded by the statistical evidence [3] offered by Mr. Huggins in support of his opinion that the alleged violence was likely to recur. That one out of four gay men have been victims of police violence or verbal abuse nationwide or in another locality does not nearly rise to the level of statistical support necessary to show that a future raid of this Club by these defendants is likely to result in assaultive and abusive behavior. Additionally, the court believes that Mr. Huggins' testimony is further undermined by the fact that he is a member of the Club. Accordingly, although the court does not question Mr. Huggins' veracity, the court is not persuaded by his opinion regarding the likelihood of recurrence and concludes that the plaintiffs have failed to establish a case or controversy regarding injunctive relief based upon the February 14, 1988, raid.

Plaintiffs attempt to overcome the difficulties inherent in seeking injunctive relief based upon past harm by claiming that they are also suffering a present and continuing harm. Specifically, plaintiffs claim that their rights are currently being injured because their fear of another raid is currently chilling their First Amendment right to freely associate at the Club. In support of this assertion, plaintiffs rely on *O'Shea* and *Lyons* for the proposition that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any *continuing, present adverse effects*." *O'Shea*, 414 U.S. at 495–96, 94 S.Ct. at 676; *Lyons*, 461 U.S. at 102, 103 S.Ct. at 1665 (quoting *O'Shea*) (emphasis added). Plaintiffs asserted at oral argument that this chilling effect on their freedom of association is such a "continuing, present adverse effect."

■ The Supreme Court in *Lyons*, however, has rejected such an argument. In response to the plaintiff's fear that he would again be choked, the Court stated:

The reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct. It is the *reality* of the threat of repeated

---

3. The court notes that the "studies" referred to by Mr. Huggins were not provided the court; thus, the court must rely on his representations as to their significance.

injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. *The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.* Of course, emotional upset is a relevant consideration in a damages action.

461 U.S. at 107 n. 8, 103 S.Ct. at 1668 n. 8 (emphasis added).

Similarly, in the present case, plaintiffs' alleged chilling effect is an emotional consequence of a prior act—the February 14, 1988, raid—and not of some present conduct by the defendants. As such, it can only support standing if there is a likelihood that the prior act will recur. Since the court has previously concluded that the plaintiffs have failed to establish a sufficient likelihood that the alleged unconstitutional conduct will recur, the additional allegation regarding a chilling effect does not elevate this otherwise nonjusticiable matter into a legitimate case or controversy under Article III. *See Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154, *reh'g denied,* 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 165 (1972) ("subjective 'chill' is not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.") [4]

*Conclusion*

In summary, the court concludes that the plaintiffs have failed to establish a justiciable case or controversy under the principles set forth in *O'Shea, Rizzo,* and *Lyons.* Although plaintiffs have satisfied the first requirement of *Lyons* by convincing the court that a similar raid will occur in the future, they have failed to satisfy the second and crucial requirement by failing to demonstrate that it is likely that this future raid will be characterized by the same or similar assaultive and insultive conduct. At best, plaintiffs alleged in their complaint, and sought to prove at the preliminary injunction hearing, that on February 14, 1988, a small number of identified and unidentified law enforcement agents engaged in isolated acts of police misconduct. Such allegations are insufficient to establish a case or controversy for injunctive relief.[5]

Of course, members of the gay and lesbian community are entitled to the same rights and privileges as all other citizens. However, there are certain legal requirements which must be met before a citizen, any citizen, may obtain injunctive relief in federal court. If these requirements are not met, a federal court is not free to act.

4. *Meese v. Keene,* 481 U.S. ——, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), relied upon by the plaintiffs, is not to the contrary. In *Meese,* a California State Senator sought to enjoin the Justice Department from designating three films he wished to exhibit as "political propaganda." At ——, 107 S.Ct. at 1864, 95 L.Ed.2d at 421. The Supreme Court noted that if the Senator had only alleged that the designation of these films as "political propaganda" deterred him from exhibiting the films by exercising a chilling effect on his First Amendment rights, he would not have standing to challenge this designation under *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). The Court found, however, that the Senator did have standing because he had "alleged and demonstrated more than a 'subjective chill;' he establishe[d] that the term 'political propaganda' threatens to cause him cognizable injury." 481 U.S. at ——, 107 S.Ct. at 1867, 95 L.Ed.2d at 424. Specifically, he supplied uncontroverted affidavits showing that the exhibition of these films would substantially harm his chances for reelection and damage his reputation. *Id.* at ——, 107 S.Ct. at 1867–68, 95 L.Ed.2d at 424–25.

Although *Meese,* like the present case, did involve allegations of a chilling effect on First Amendment rights, the standing inquiry was entirely different in that case than the present case. As demonstrated by the above discussion, the focus of the standing inquiry in *Meese* was whether the plaintiff had alleged a sufficient injury, not whether the conduct giving rise to the injury was likely to recur. There was no question in that case as to whether the Justice Department would designate those films as "political propaganda," only whether such a designation injured the plaintiff. Thus, plaintiffs' reliance on *Meese* is misplaced.

5. Because of this conclusion, it is not necessary for the court to reach the merits of plaintiffs' allegations or proof, except insofar as they pertain to the question of standing. Accordingly, the court's holding should not be interpreted by either party as an indication of how the court would have resolved the conflicting testimony regarding the events which occurred on February 14, 1988, had it been necessary for the court to do so.

This is not to say, however, that law enforcement officials are free to violate the constitutional rights of citizens so long as they only do so on a single occasion. As noted in *O'Shea* and *Lyons*, "withholding injunctive relief does not mean that the 'federal law will exercise no deterrent effect in these circumstances.' If [a citizen] has suffered an injury barred by the Federal Constitution, he has a remedy for damages under § 1983." *Lyons*, 461 U.S. at 112–13, 103 S.Ct. at 1671 (quoting *O'Shea*, 414 U.S. at 503, 94 S.Ct. at 679).[6]

Accordingly, plaintiffs' request for preliminary injuctive relief will be denied. In addition, because plaintiffs have not alleged any facts in their complaint which, if taken as true, would show a likelihood of recurrence, plaintiffs' complaint, insofar as it seeks injunctive relief, will be dismissed.

An appropriate order will follow.

---

**6.** In addition, if the Club were to be raided in the future and again brought allegations of similar unconstitutional conduct, they may then possess the standing they currently lack.