<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 04-1059**

———————————

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF
COLORED PEOPLE, Western York County Branch;
KEITH HUNTER, Reverend; STEVE LOVE; JOSIE
LOWRY; PHYLLIS WARD,

Plaintiffs - Appellants,

versus

KEVIN BRACKETT, sued in his official capacity
as Deputy Solicitor of York County and in his
personal capacity; TOMMY POPE, sued in his
official capacity as Solicitor of York County
and in his personal capacity; MARVIN BROWN,
sued in his official capacity as an officer of
the York County Police Department and in his
personal capacity; TERRELL HARRIS, sued in his
official capacity as an officer of the York
County Police Department and in his personal
capacity,

Defendants - Appellees,

and

YORK COUNTY, SOUTH CAROLINA; UNKNOWN OFFICERS
1 THROUGH 20 OF THE YORK COUNTY POLICE
DEPARTMENT, sued in their official capacities
as officers of the York County Police
Department and in their individual capacities,

Defendants.

-----------------------------------------------

NICHOLE BELL; KATHY ROBERTS,

Movants.

Appeal from the United States District Court for the District of South Carolina, at Rock Hill. Joseph F. Anderson, Jr., Chief District Judge. (CA-02-2329)

Argued: February 2, 2005                    Decided: May 16, 2005

Before NIEMEYER, MICHAEL, and DUNCAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Alexander M. Sanders, Jr., Charleston, South Carolina, for Appellants. Terry B. Millar, Rock Hill, South Carolina; Donna Seegars Givens, WOODS & GIVENS, L.L.P., Lexington, South Carolina, for Appellees. **ON BRIEF:** Mark J. MacDougall, Heather J. Pellegrino, AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P., Washington, D.C.; William N. Nettles, John D. Delgado, Columbia, South Carolina; Hannibal G. Williams II Kemerer, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Baltimore, Maryland, for Appellants. Darra J. Coleman, WOODS & GIVENS, L.L.P., Lexington, South Carolina, for Appellee Terrell Harris.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

The Western York County Branch of the National Association for the Advancement of Colored People and four of its members (collectively, "the NAACP") filed this § 1983 action to enjoin four individuals in the York County, South Carolina, Solicitor's Office and the York County Police Department (collectively, "the defendants") from depriving the NAACP and its members of their First Amendment rights. The NAACP alleges that the defendants engaged in a campaign of intimidation by questioning NAACP members at their homes about the substance of an NAACP meeting, following them in police cars, and attempting to exclude them from the courtroom during the retrial of an African-American charged with murder. The district court awarded summary judgment to the defendants. We conclude that the NAACP has produced insufficient evidence of the likelihood of future irreparable harm and therefore affirm.

I.

We review the facts in the light most favorable to the NAACP, the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). On January 10, 2002, the NAACP held an open meeting to discuss the pending retrial of Sterling Spann, an African-American York County resident whose 1981 capital murder conviction and death sentence had been overturned by

3

the South Carolina Supreme Court in 1999. Spann, who had been released on bond pending retrial, attended the meeting along with three members of his legal team. The night before the NAACP meeting, York County Solicitor Tommy Pope and his deputy Kevin Brackett sought a gag order in a telephone hearing to prevent Spann and his lawyers from publicly disclosing information about a polygraph test that Spann had taken. The presiding judge in the Spann case verbally ordered both sides to refrain from publicly discussing the polygraph information.

The next day, January 10, 2002, Brackett and Pope learned that the NAACP was planning to meet that night to discuss the Spann case. They directed Marvin Brown, head of the York County Multi-Jurisdictional Drug Enforcement Unit, to "get somebody to go over" to the meeting to "hear what they had to say." J.A. 232-33. Brackett told Brown that he "wanted a black person, a black male or female, a black officer," and Brown ordered Officer Terrell Harris, who is African-American, to attend and observe the meeting in plainclothes. J.A. 328. At the meeting either Spann or an investigator on Spann's defense team discussed the polygraph evidence. The following day, Harris gave a written report about the meeting to Brackett and Pope.

Nearly one month later, on February 5, 2002, Brackett again contacted Brown and told him to locate and question NAACP members who attended the January 10 meeting. For the next several

4

days, certain of the defendants visited the homes of seven or eight NAACP members, including plaintiffs Josie Lowry, the NAACP Branch Membership Chairperson; Steve Love, the Political Action Chair; and Phyllis Ward, the Freedom Fund Chair. These visits were usually made without prior notification and sometimes occurred in the evening. Harris wore a "Drug Enforcement Unit" badge around his neck during all of his visits. J.A. 340-41. One of the visits occurred on February 6, 2002, when Harris and Brown appeared at Lowry's home unannounced at approximately 8:20 p.m. Due to the late hour, Lowry asked the officers to come back the next day. When the officers returned the next afternoon, they told Lowry that they needed to question her "to be sure that no laws had been broken at the [January 10] meeting." J.A. 471. Solicitor Pope himself questioned Ward, asking her if the NAACP "felt like th[e Spann] case was a racial thing." J.A. 599.

Many NAACP members believed that the defendants' investigation was creating an "atmosphere of intimidation." J.A. 574. Longtime NAACP member Ernestine Wright compared it to a time when "[y]ou were almost afraid to say that you were a member of the NAACP." J.A. 687. Several members expressed their concerns to the Reverend Keith Hunter, the Branch President. Hunter and Love arranged a meeting with Pope and Brackett on February 11, 2002. At the meeting Hunter and Love formally asked the defendants to stop intimidating NAACP members. Pope and Bracket replied that the

5

questioning was a necessary part of their investigation into "issues of jury tampering or a violation of a gag order," J.A. 245, and asked Hunter and Love whether they were trying "to stack the court room with African-Americans" or "intimidate the jury" in the Spann retrial, J.A. 440-41. Pope and Brackett said they would continue to send the police to interview NAACP members and that an officer had been dispatched to interview a member that same evening.

About one week after this meeting, two NAACP members began to observe police vehicles following them. Branch Treasurer Dorothy Williams noticed a marked Sheriff's car following her after she left the Wesley United Methodist Church where she had been working on NAACP business. Hunter saw a black sedan following him for extended distances on three occasions. J.A. 422-23. On the third occasion Hunter pulled over to write down the sedan's license plate number. The number belonged to a black, four-door Crown Victoria assigned to Detective Timothy Smith of the York County Sheriff's Office.

The defendants' investigation of the NAACP made it more difficult for the Branch to recruit new members. One prospective member said one reason she did not join the NAACP was that she "didn't want to join because . . . [of] the police coming to NAACP members' houses." J.A. 711. In the wake of the investigation, the

6

Branch has suffered a decrease in membership and a decline in attendance at general meetings.

On March 4, 2002, the venire was assembled for jury selection in Spann's retrial. During preliminary questioning, Pope and Brackett asked the court to require potential jurors to specify whether they were NAACP members. The court denied the request, and thereafter an employee in the solicitor's office placed Hunter, Love, and Ward on the potential witness list. Neither Hunter, Love, nor Ward had any personal knowledge of the facts of the Spann case, and none of them had been served with a subpoena or questioned by any law enforcement officer about the case. Subpoenas were issued for all of the other witnesses on the state's witness list. Pope and Brackett maintain that they do not know or remember who placed Hunter, Love, and Ward on the witness list. The only explanation the defendants offer for why these three were placed on the state's witness list is that "[i]t may have had something to do with the change of venue motion or mitigation evidence in the penalty phase of the trial." Brief for Appellees at 23. Once on the witness list, Hunter, Love, and Ward would have been excluded from the courtroom for the duration of the Spann retrial. (There was no retrial because Spann pled guilty.)

The NAACP, Hunter, Love, Lowry, and Ward invoked 42 U.S.C. § 1983 to sue Brackett, Pope, Brown, and Harris, in their official and personal capacities. The plaintiffs seek a permanent

7

injunction prohibiting the defendants from questioning, threatening, or detaining NAACP members in connection with lawful activities protected by the First Amendment. The district court granted summary judgment to the defendants on the basis that the NAACP had not produced sufficient evidence (1) that the defendants had violated their constitutional rights or (2) that the NAACP might suffer future irreparable harm. The NAACP appeals.

## II.

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We review a grant of summary judgment de novo. Higgins v. E.I. DuPont De Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). The NAACP argues that the defendants, by monitoring its meetings and interviewing and tailing its members, engaged in a campaign of harassment and intimidation that violated the First Amendment rights of the organization and its membership to free association and to recruit new members. The defendants reply, in essence, that their actions were part of a legitimate investigation into the possible violation of a court order. The NAACP also argues that the office of the solicitor's placement of Hunter, Love, and Ward on the state's witness list for the Spann retrial deprived these individuals of their First Amendment right to attend criminal

8

trials.  The solicitor's office responds to this troubling incident by saying that someone in the office, whose identity is unknown, placed these names on the list, and "[i]t may have had something to do with the change of venue motion or mitigation evidence in the penalty phase of the trial."  Brief for Appellees at 23.  These disputes need not be resolved, however, because the NAACP has not proffered evidence to demonstrate that future violations of the constitutional rights of the organization and its members are likely to occur, and such a showing is a prerequisite for obtaining injunctive relief.  See City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983).  Specifically, the plaintiffs must show "(1) that it is likely that they again will find themselves in the same or similar circumstances giving rise to the allegedly unconstitutional conduct; and (2) that it is likely that they again will be subjected to the allegedly unconstitutional conduct."  Travelers Social Club v. Pittsburgh, 685 F. Supp. 929, 932 (W.D. Pa. 1988).  In addition, "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate."  Lyons, 461 U.S. at 112.  The NAACP contends that the evidence establishes an issue of material fact with respect to the likelihood of future irreparable harm because the organization will continue to take an active role in advocating for

9

the rights of African-American defendants in criminal cases and because Pope and Brackett have said that they would continue to interview NAACP members. These facts, however, are not enough to demonstrate that future harm is likely.

First, while it is a given that the NAACP will continue to advocate for the rights of African-American defendants in criminal cases, the organization has not shown that it is likely that it will again find itself in circumstances the same as or similar to this case. There is a dispute over whether the defendants' investigation was part of a legitimate law enforcement effort or was used as a pretext to harass the NAACP, but it is undisputed that the defendants' conduct began in response to the court order prohibiting Spann's defense team from discussing the results of a polygraph examination. The Western York County Branch of the NAACP's advocacy for the rights of an African-American defendant in a case involving a gag order presents an unusual circumstance. The NAACP has produced no evidence that it has been subjected to harassment or investigation due to its advocacy in other cases.

The defendants have offered a dubious explanation for the placement of the names of Hunter, Love, and Ward on the witness list for Spann's retrial, but (this case aside) there is no evidence that the solicitor's office has manipulated witness lists in the past, or is likely to manipulate them in the future, to keep

10

interested NAACP members from attending trials. The NAACP has made only one allegation of police misconduct occurring after the Spann case concluded, and this allegation is insufficient to create a genuine issue of material fact. Specifically, the organization alleges that on January 9, 2003, a police officer parked in an unmarked vehicle at the Wesley United Methodist Church for at least an hour. When NAACP (and church) members approached the car to determine why it was in the church parking lot, the officer said he was "trying to clean up the drugs in [the] community." J.A. 722A. Deputy Sheriff J. M. Ligon stated in an affidavit that he was the officer parked in the church lot that day, and he was there waiting to assist in a search with his drug dog. He said, "I did not know the name of the church at the time . . . . The only reason I was at the church parking lot was to be in close proximity to the location where the narcotics surveillance team was going to execute a search warrant." J.A. 723. There is no evidence suggesting that Deputy Ligon's account is inaccurate, and, in light of Ligon's reason for parking in the church lot, his statement that was "trying to clean up the drugs" is a straightforward explanation for his presence; it does not suggest an attempt to intimidate. In sum, the NAACP has not produced evidence that it is likely to find itself in future circumstances similar to those in this case. See, Lyons, 461 U.S. at 111.

11

Second, there is a lack of evidence that the NAACP will continue to be subjected to the alleged unconstitutional conduct. Although Pope and Brackett said they would continue to interview NAACP members, their statement was limited to interviews relating to the NAACP meeting involving the Spann retrial. Because the NAACP can not show a sufficient likelihood that it and its members will be subjected to future violations of their constitutional rights, the defendants are entitled to summary judgment.

Accordingly, the district court's order awarding summary judgment to the defendants is affirmed.

<u>AFFIRMED</u>

12