# United States Court of Appeals for the Federal Circuit

---

**MADSTAD ENGINEERING, INC. AND MARK STADNYK,**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES PATENT AND TRADEMARK OFFICE, MICHELLE K. LEE, DEPUTY DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, AND UNITED STATES,**
*Defendants-Appellees.*

---

2013-1511, -1512

---

Appeal from the United States District Court for the Middle District of Florida in No. 12-CV-1589, Judge Steven D. Merryday.

---

Decided: July 1, 2014

---

JONATHAN S. MASSEY, P.C., Massey & Gail LLP, of Washington, DC, argued for plaintiffs-appellants.

MARK R. FREEMAN, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC, argued for defendants-appellees. With him on the brief were STUART F. DELERY, Assistant Attorney General, A. LEE BENTLEY, III, Acting United States Attor-

ney, and SCOTT R. MCINTOSH, Attorney. Of counsel on the brief were NATHAN K. KELLEY, Deputy General Counsel for Intellectual Property Law and Solicitor, SCOTT C. WEIDENFELLER and AMY J. NELSON, Associate Solicitors, United States Patent and Trademark Office, of Alexandria, Virginia.

—————————————

Before NEWMAN, O'MALLEY, and WALLACH, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

In this constitutional challenge, Mark Stadnyk and MadStad Engineering, Inc. (collectively, "MadStad") filed suit against the United States Patent and Trademark Office ("PTO"), its then director, David Kappos, in his official capacity, and the United States of America (collectively, "the Government") in the United States District Court for the Middle District of Florida. *MadStad Eng'g, Inc. v. U.S. Patent & Trademark Office*, No. 8:12-cv-1589, ECF No. 1 (July 18, 2012). MadStad sought a declaratory judgment that the "first-inventor-to-file" provision of the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, § 3, 125 Stat. 284, 285–294 (2011) is unconstitutional and a permanent injunction barring enforcement of the AIA.

The district court granted the Government's motion to dismiss for lack of standing. *MadStad Eng'g, Inc. v. U.S. Patent & Trademark Office*, No. 8:12-cv-1589, 2013 WL 3155280 (M.D. Fla. May 8, 2013). MadStad appeals this dismissal and requests that we declare the AIA to be unconstitutional. For the reasons explained below, we affirm the district court's finding that MadStad lacks standing to challenge the AIA in this action; we therefore do not reach MadStad's constitutional arguments.

### I. BACKGROUND

On September 16, 2011, the President signed into law the AIA.  The AIA, *inter alia*, adopted the "first-inventor-to-file" principle for determining priority among patents and patent applications.  AIA § 3, 125 Stat. at 285–294.  Before the AIA, the United States typically gave priority to the first to invent.[1]  Under the AIA, however, priority will go to the first inventor *to file a patent application*.  The named inventor must have invented the invention independently and not derived the idea from another.  *See* 35 U.S.C. § 102 (2012).

On July 18, 2012, MadStad filed suit in the United States District Court for the Middle District of Florida, alleging that the first-inventor-to-file provision of the AIA is unconstitutional under Article I, Section 8, Clause 8 of the Constitution and that the challenged provision was not severable from the remainder of the Act.  The complaint sought a declaration that the entirety of the AIA is unconstitutional and a permanent injunction barring its enforcement.

The parties agreed that no material issues of fact were in debate and that MadStad's claim could be resolved as a matter of law.  Mr. Stadnyk is a resident of Florida and the named inventor on three patents.[2]  His company, MadStad Engineering, is a Florida corporation that develops and markets his inventions.  Mr Stadnyk submitted an unchallenged declaration in support of his

---

[1]    There were some exceptions to this general rule.  *See* 35 U.S.C. § 102(g) (2006) (stating that, if the first inventor abandoned, suppressed, or concealed the invention, the second inventor would get priority); *Gayler v. Wilder*, 51 U.S. 477, 496–98 (1850) (same).  But it remained the governing principle nonetheless.

[2]    *See* U.S. Pat. Nos. 7,458,626; 7,832,783; 8,118,511.

claimed standing to pursue his challenge to the AIA. After considering the parties' submissions, the district court dismissed the action for lack of standing, without oral argument or an evidentiary hearing. *MadStad*, 2013 WL 3155280, at *7.

MadStad timely appealed, arguing that the district court erred in holding that the plaintiffs lack standing to challenge the constitutionality of the AIA. Thus, Mad-Stad argues that we should address the merits of its claim and find the first-inventor-to-file provision of the AIA, and the AIA in its entirety, unconstitutional.

## II. DISCUSSION

We first discuss whether we are authorized to decide this case under Article III.

## A. Jurisdiction

Neither party disputes this court's jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1) (2012). As a court of limited jurisdiction, however, we still must address this issue. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) ("Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto . . . . For that reason, every federal appellate court has a special obligation to satisfy itself . . . of its own jurisdiction." (citation omitted)). Indeed, MadStad itself was sufficiently unsure of whether this court possesses jurisdiction over this matter that it filed a protective appeal in the United States Court of Appeals for the Eleventh Circuit soon after initiating this appeal. *See* Appellant's Br. 1–2.

The Federal Circuit has exclusive jurisdiction over appeals "from a final decision of a district court . . . in any civil action *arising under*, or in any civil action in which a party has asserted a compulsory counterclaim arising

under, any Act of Congress relating to patents." 28 U.S.C. § 1295(a)(1) (emphasis added).[3] Because MadStad does not assert a claim under the AIA and, instead asserts a claim directly under the constitution challenging the AIA's constitutionality, we must determine whether MadStad's claims "arise under" an Act of Congress relating to patents as that jurisdictional principle has been interpreted by the United States Supreme Court.

The Supreme Court's "arising under" jurisprudence has developed in cases assessing whether a case sufficiently arises under federal law to authorize federal courts to exercise jurisdiction over the claims asserted. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314–15 (2005) (establishing federal jurisdiction where the interpretation of a federal statute was essential to the state law claim). Thus, the Court has on a number of occasions assessed whether a claim arises only under state law or, alternatively, involves a sufficiently substantial federal issue to justify federal jurisdiction or—where patent-related issues are involved—even preempt state court jurisdiction over a matter. *See, e.g., Gunn v. Minton*, __ U.S. __, 133 S. Ct. 1059, 1068 (2013) (holding that malpractice claims, based on an attorney's handling of a patent case, are not subject to exclusive jurisdiction of federal courts). While resolution of these questions has, at times, resulted in a conclusion that a regional circuit Court of Appeals, rather than this Circuit, properly would have jurisdiction over the appeal at issue, that conclusion still turned on whether the question presented was one of state law cognizable in federal court only by virtue of its diversity jurisdiction, or one arising under the patent laws. *See Christianson v. Colt Indus.*

---

[3] We note that the AIA also changed Section 1295. *See* AIA § 19, 125 Stat. at 331–32. These changes, however, do not affect our jurisdiction over this appeal.

*Operating Corp.*, 486 U.S. 800, 817 (1988) (holding that the appeal belonged before the regional circuit because the claims did not arise under patent law); *cf.* 28 U.S.C. § 1295 (establishing jurisdiction in the Federal Circuit when there is a "compulsory counterclaim arising under" patent law).

The Supreme Court has not had occasion to determine whether a claim attacking the constitutionality of an Act of Congress relating to patents is one arising under that Act of Congress within the meaning of 28 U.S.C. §§ 1295 and 1338. It appears, moreover, that we have faced this question only once. In *Patlex Corp. v. Mossinghoff*, 758 F.2d 594 (Fed. Cir. 1985), we considered whether "certain provisions of the patent reexamination statute and implementing regulations" were unconstitutional under the Fifth and Seventh Amendments of the United States Constitution. 758 F.2d at 596. While, as here, appeals from the trial court's resolution of their claims were originally asserted in both the relevant regional circuit—the Third Circuit—as well as this one, the Third Circuit dismissed its appeal upon motion that the appeal was properly brought in the Federal Circuit, and we proceeded to decide the matter. *See id.* at 598 n.5. We did so without analysis of the jurisdictional question, however.[4]

Upon consideration, we conclude that jurisdiction over this appeal lies properly in this court. As the Supreme Court has made clear in other contexts, a matter can still "arise under" an Act of Congress even when the claim "finds its origin" in other legal predicates. *See Gunn*, 133 S. Ct. at 1064. While the Supreme Court has not ad-

---

[4]   In *Brooks v. Dunlop Manufacturing Inc.*, 702 F.3d 624 (Fed. Cir. 2012), we addressed the constitutionality of another portion of the AIA, but this court unquestionably had jurisdiction based on the other claims in the case. 702 F.3d at 626–28.

dressed whether a claim which finds its origin in the United States Constitution can also be said to arise under a federal statute for jurisdictional purposes, we believe the Supreme Court's jurisprudence counsels in favor of the conclusion that, in this case, it does.[5]

When assessing when a state law claim can be said to arise under federal law, the Supreme Court considers "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* at 1065. While not perfectly translatable to the question before us, these guideposts are helpful. First, a resolution of the constitutional challenge here would require this court to interpret the terms "inventor" and "first-inventor-to-file" under the AIA and to assess the interactions between those terms and the use of the term "Inventor" in the Intellectual Property Clause of the United States Constitution—Article I, Section 8, Clause 8. It will also cause us to address the scope of protections afforded to "inventors" by the right to bring derivation actions encompassed within the first-inventor-to-file provision of the AIA.

Second, a review of the parties' briefs, both on the merits and with respect to the standing question, makes clear that these matters are at the heart of the parties' dispute. If MadStad is to be believed, moreover, they are

---

[5]    It is not surprising that the Supreme Court has not yet addressed this question. Outside the context of patent law, the precise federal origin of a claim is largely irrelevant since it is the fact that the claim originates in something that gives rise to federal subject matter jurisdiction—the Constitution, laws, or treaties of the United States—that resolves any jurisdictional doubts. Even in the patent arena, it is only at the Appellate level that this unusual jurisdictional issue arises.

certainly substantial to the current state of patent law; a resolution in MadStad's favor would not only result in a declaration that the first-inventor-to-file provision of the AIA is unconstitutional and, unenforceable, but could compel the conclusion that the entirety of the AIA falls along with that alleged defective provision. This is precisely the type of issue the Supreme Court classifies as substantial in the relevant sense: "[t]he substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole." *Gunn*, 133 S. Ct. at 1066. Indeed, in *Grable*, the Court described a state claim challenging the constitutionality of government action as the "classic example" of a claim which, though having its origin in state law, arises under federal law for jurisdictional purposes. *Grable*, 545 U.S. at 312 (referring to *Smith v. Kan. City Title Trust Co.*, 255 U.S. 180 (1921), where state plaintiff's claim called into question the constitutional validity of an Act of Congress).

Finally, to the extent Congress has attempted to "balance" the matters committed to the jurisdiction of this court and those committed to the regional circuits, we believe that balance would be upset by placing jurisdiction over interpretations of the AIA and an assessment of its constitutional validity in the hands of any circuit other than this one. Through 28 U.S.C. § 1338(a), Congress placed the resolution of actions arising under an Act of Congress relating to patents exclusively within the federal courts. Through 28 U.S.C. § 1295(a)(1), Congress placed appeals from such matters exclusively within the province of the Federal Circuit. The importance of the matters raised by MadStad's complaint to the continued uniform application of the patent laws is clear.

For these reasons, we find, as we did impliedly in *Patlex*, that MadStad's claims and this appeal "arise under" an Act of Congress relating to patents within the meaning

of both 28 U.S.C. §§ 1338 and 1295(a)(1) and that we, thus, may properly exercise jurisdiction over this appeal.[6]

## B. Standing

Although we have statutory jurisdiction over its appeal, MadStad must have standing under Article III to assert that claim before we may reach the merits. To satisfy the minimum standing requirements of Article III, a party must demonstrate an injury in fact that is: (1) "concrete, particularized, and actual or imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). The party invoking federal jurisdiction has the burden of establishing each of these elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Standing is a jurisdictional question whose resolution we review de novo. *Id*. at 560–561.

The Supreme Court recently addressed when a party has standing to challenge, pre-enforcement, the constitutionality of governmental regulation; indeed, it has done so twice. In the 2013 term, the Supreme Court decided *Clapper v. Amnesty International USA*, __ U.S. __, 133 S. Ct. 1138 (2013) and, at the end of its current term, the Court decided *Susan B. Anthony List v. Driehaus*, No. 13-193, 2014 WL 2675871, at *5 (June 16, 2014). We turn first to *Clapper* because that is the decision upon which the district court premised its judgment. There, "attor-

---

[6]  In addition, because the upshot of MadStad's claim is that the pre-AIA version of the Patent Act was never constitutionally amended, and thus, should continue to govern patent applications, it is arguable that his claims can be said to arise directly under the 1952 Patent Act. In either case, it is clear that this Court of Appeals has jurisdiction over its appeal.

neys and human rights, labor, legal, and media organizations whose work allegedly requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad" (collectively, "Amnesty") brought a constitutional challenge to the Foreign Intelligence Surveillance Act ("FISA"). 133 S. Ct. at 1145. Congress had amended § 1881a of FISA to allow the Government to acquire intelligence from any non-U.S. person reasonably believed to be located outside the U.S., without requiring authorization by an Article III judge based on a finding of probable cause. *See* 50 U.S.C. § 1881a (2012); *Clapper*, 133 S. Ct. at 1144. Amnesty alleged that some of their foreign contacts were likely subject to surveillance under the amended FISA. According to Amnesty, the threat of surveillance under this amendment will force them to travel abroad to have in-person conversations and undertake other costly measures to protect the confidentiality of sensitive communications. *Clapper*, 133 S. Ct. at 1145–46.

The Supreme Court held that Amnesty did not have standing to assert a constitutional challenge to FISA because its argument rested on its speculative, subjective fear that:

 (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of [Amnesty's] contacts; and (5) [Amnesty] will be [a] part[y] to

the particular communications that the Government intercepts.

*Id.* at 1148. Because it found each of these steps highly speculative and contingent on specific choices by the Government, the FISA Court, and Amnesty itself, the Supreme Court "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 1150.

MadStad asserted standing below, arguing that it "has numerous inventions at different stages of development" and the AIA: (1) forces MadStad to enhance computer security to protect against an increased threat of computer hacking and theft of its intellectual property ("IP"); (2) increases the time and effort required to file extra patent applications; (3) puts MadStad at a competitive disadvantage with larger companies; and (4) causes MadStad to lose business and investment opportunities for fear of IP theft. *MadStad*, No. 8:12-cv-1589, ECF No. 1, at 8–12; *see MadStad Eng'g, Inc. v. U.S. Patent & Trademark Office*, No. 8:12-cv-1589, ECF No. 30, at 2–10 (Sep. 28, 2012).[7]

---

[7] MadStad argues that the district court only considered its first alleged injury in its order dismissing the case. **[JA12–14]**. We disagree. The district court's analysis clearly applied to each of MadStad's arguments, even if it treated them collectively. *See, e.g., MadStad*, 2013 WL 3155280, at *6 ("The same line of reasoning serves to classify as neither certain nor impending the array of 'counter-measures'—the third-party contracting for samples, the prophylactic filing of defensive patent applications, and other contingent items—featured by the plaintiffs in an attempt to demonstrate causation and standing.").

The district court rejected MadStad's assertion of standing, relying on *Clapper*. The lower court concluded:

> In each case, the plaintiffs responded to a felt need to expend money to avoid entirely hypothetical consequences of legislation, that is, in each case the plaintiffs expended funds in response to an entirely subjective and self-actuated trepidation about conjectural events. In each case, actualization of the conjectural events depends upon the contingent action of a third party . . . . In each case, the expenditures in anticipation of these conjectural events are controlled entirely by the judgment and discretion of the plaintiffs . . . .

*MadStad*, 2013 WL 3155280, at \*6. In other words, the district court found that, in order for MadStad to actually suffer any injury fairly traceable to the AIA, an "acutely attenuated concatenation of events" was required. Based on this finding, the district court determined that MadStad failed to prove that any injury was actual or imminent under *Clapper* and therefore lacked standing to challenge the constitutionality of the AIA. *Id.*

On appeal, MadStad contends that the district court's reliance on *Clapper* was misplaced because the threats of harm upon which it relies are far less speculative than those asserted in *Clapper*. It also asserts that it faces a sufficient "substantial risk" of suffering the injuries it identifies to satisfy Article III standing under traditional standing principles which the *Clapper* Court did not expressly reject.

### 1. MadStad's alleged harms

We review each of MadStad's alleged injuries in turn to determine whether they are sufficient to support the minimum requirements for Article III standing, individually or collectively.

### a. Increased risk of computer hacking

MadStad alleges that it has been forced to increase its computer security because the AIA has made it more attractive and profitable for computer hackers to steal IP and file their own patents. Because MadStad claims it has *already* expended money to enhance its security in response to this alleged increased threat, it argues that it has suffered redressable injury directly caused by the AIA. *MadStad*, No. 8:12-cv-1589, ECF No. 1, at 8–9.

The district court found that this scenario was too far-fetched because it assumes too much. Specifically, the trial court found that, to conclude that MadStad's need to undertake additional security measures is traceable to the AIA, it would have to assume that, (1) although knowing of hacking threats to its intellectual property generally, MadStad would not have acquired, installed, and operated the available state-of-the-art security, regardless of the AIA, (2) thieves will successfully hack MadStad's computers and discover patentable IP, (3) those thieves would apply for a patent before MadStad does so, (4) the thieves would succeed in receiving a patent, and (5) they would be able to disguise their theft so as to defeat a challenge by MadStad in a derivation proceeding. *MadStad*, 2013 WL 3155280, at *6.

On appeal, MadStad argues that the district court incorrectly assumed that it would not purchase additional security equipment because of the AIA. MadStad contends that it has already suffered injury attributable to the AIA because it *did* purchase and implement enhanced security measures after the passage of the AIA. MadStad further insists that the district court incorrectly assumed that computer hacking is an "exotic scenario." MadStad contends that it detects intrusions on its system every week and points to a number of statistics that indicate computer hacking is prevalent in the United States.

MadStad's arguments miss the mark. In order to establish standing, the injury must be, *inter alia*, "fairly traceable to the challenged action." *Monsanto*, 561 U.S. at 149. The point of the district court's analysis was not to downplay the risk of hackers, but to emphasize all of the unlikely steps required for MadStad to suffer injury *fairly traceable* to any alleged *increased* risk of hacking caused by the AIA. *See MadStad*, 2013 WL 3155280, at *6. The mere fact that MadStad, like all other people and companies, faces cyber threats does not create standing. In fact, MadStad cites statistics that indicate hacking was a growing threat well *before the AIA was even enacted.*

Thus, even if the AIA were never enacted, it is clear that MadStad would still be at risk from the "weekly" attacks on its computer system, giving it incentive to install the best protection against such attacks that is available. Indeed, as MadStad admits, it had computer security systems in place well before the AIA. Oral Argument at 3:47, *MadStad Eng'g, Inc. v. U.S. Patent & Trademark Office*, 2013-1511, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 13-1511.mp3 ("[MadStad] does have some [computer] security."). Even accepting the proposition that MadStad did choose to install heightened security in response to the AIA, we see nothing in the record that indicates that, in response to the AIA, hackers would start launching cyber-attacks which MadStad's old security system could not handle, but the upgraded system could. *See Clapper*, 133 S. Ct. at 1148. The alleged increased threat is, thus, solely based on speculation about the capabilities and incentives of illegal hackers. These assumptions are not enough to create standing. *See id.* at 1152 ("Another reason that respondents' present injuries are not fairly traceable to [the Act] is that even before [the Act] was enacted, they had a similar incentive to engage in many of the countermeasures that they are now taking."). As the trial court concluded, MadStad's standing claim is "dilut-

ed" by the fact that it is unlikely that MadStad, "with or without the AIA[,] would not avail itself to the state-of-the-art computer security to defend against the persistence and threatening hacking of IP thieves." *MadStad*, 2013 WL 3155280, at *6.

Even if cyber-attacks were to increase because of the AIA, moreover, MadStad has not presented any evidence that, because of the AIA, there will be an increase in *successful* cyber-attacks orchestrated to steal a company's IP so that a hacker can quickly file a patent on that IP. Thus, even assuming that the AIA "creates an unparalleled reward system for corporate espionage and hacking," Appellant's Br. 33, the belief that there will be an increase in successful cyber-attacks attributable to the AIA still rests on speculation about the illegal decisions of independent actors. *See Clapper*, 133 S. Ct. at 1150 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."). In other words, the alleged injury that is "fairly attributable" to the AIA—the potential increased risk of successful cyber-attacks in a first-inventor-to-file system—is predicated solely upon the unsupported assumption that hackers, in response to the AIA, will increase efforts to illegally steal IP by launching more cyber-attacks for the precise purpose of prosecuting a patent thereon. Again, because this alleged injury is dependent upon the hypothetical, illegal decisions of independent actors, it is not "concrete, particularized, and actual or imminent." *Monsanto*, 561 U.S. at 149; *see Clapper*, 133 S. Ct. at 1148 ("Yet respondents have no actual knowledge of the Government's § 1881a targeting practices. Instead respondents merely speculate and make assumptions about whether their communications with their foreign contacts will be acquired under § 1881a.").

Finally, even assuming that the AIA leads to an increase of cyber-attacks, that those attacks are successful,

and that one of those attacks allows a hacker to steal MadStad's IP for the intended purpose of obtaining a patent thereon, that hacker would still have to interpret all of MadStad's data, finish developing the product to a point where it can be patented, successfully file for a patent, and prosecute that application successfully, all before MadStad can file its own patent application. As MadStad emphasizes, filing for a patent is not a quick, easy, inexpensive process. *See* Joint Appendix ("J.A.") 25 ("Each patent application costs approximately $10,000 for minimally complex products."); Appellant's Br. 20. Each of these required steps only makes the alleged injury more attenuated and less imminent. *See Clapper*, 133 S. Ct. at 1147 ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (quoting *Lujan*, 504 U.S. at 564 n.2) (emphasis in original)).

Given these circumstances, we find that the district court did not err in concluding that, under *Clapper*, MadStad failed to establish standing arising from the alleged increased risk of hacking caused by the AIA or any expenditures MadStad may have made in cyber security because of that perceived risk.

### b. Increased time and effort to file additional patent applications

MadStad next argues that it is injured by the AIA because the Act forces it "to divert business resources to prepare more patent applications and file them sooner, in order to compete in the race to the PTO." Appellant's Br. 21. MadStad contends that, although large companies can easily absorb the additional cost, small companies do not have the resources necessary to file additional patent applications to prevent another from filing for the same patent first.

We, of course, turn to the record to determine whether MadStad personally has suffered actual or imminent injury because of the AIA. MadStad argues that Mr. Stadnyk is an inventor who has patented inventions in the past and that he intends to continue—and is, in fact continuing—researching and developing new inventions, which he would then patent. *See* Appellant's Reply 4–5; *see also* J.A. 62–63. Because he is now operating under the first-inventor-to-file system of the AIA, MadStad asserts that Mr. Stadnyk will be forced to move that process more quickly and file applications for patents on his inventions at an earlier point in the process than he might otherwise desire to do.

As the Government points out, however, MadStad has not asserted that he has filed any recent patent applications (i.e., after the March 16, 2013 effective date of the first-inventor-to-file provision) and does not point to any particular invention he claims is ready for patenting. The Government argues, moreover, that, in order to establish standing, MadStad must not only have an invention that is ready for patenting and file an application for a patent on that invention, but must also be faced with a rejection based on an earlier filed application on that same invention and lose a derivation proceeding he initiates to challenge that earlier filing. *See* Oral Argument at 22:05, 24:35.[8]

---

[8]  In its lower court brief, the Government specifically argued that, to establish standing, MadStad:

would have to establish that all of the following contingencies will occur: (1) Plaintiffs' invention becomes "patentable" (2) only after the first-inventor-to-file provision take[s] effect in mid-March 2013; (3) Plaintiffs decide to seek a patent on that invention; (4) another party independently

MadStad says that the government requires too much. MadStad points to a written declaration by Mr. Stadnyk where he explains:

> The Government has raised a question as to whether my new (currently non-patented) inventions will ultimately meet the necessary preconditions for obtaining a patent. I am operating on the *assumption* that they will meet the requirements of patentability. I *believe* that some of my inventions are in fact close to patentability. I am continuing to research, develop, and test my inventions in preparation for filing patent applications. Certainly, prior to the AIA, I had every intention of patenting them. As a result of the enactment of the AIA, MadStad and I face increased costs and burdens from having to operate in a First-[Inventor-]to-File environment.

J.A. 62–63 (emphases added). MadStad explains that "in the real world, small inventors face countervailing needs—to develop their inventions further, attract investment, and persuade business partners that the invention is viable." Appellant's Reply 6. MadStad argues that, under the first-to-invent system, small inventors are forced to file applications containing inadequate descriptions of the inventions or insufficient testing data and, thus, are less likely to ripen into a patent, or less likely to ripen into a patent that actually is enforceable. And, MadStad claims that it is suffering *current* injury by its

---

invents the same invention (5) after Plaintiffs have invented it; and (6) the other party files for a patent (7) before plaintiffs do so, thereby securing the patent and foreclosing Plaintiffs' application.

*MadStad Eng'g, Inc. v. U.S. Patent & Trademark Office*, No. 8:12-cv-1589, ECF No. 29, at 19 (Sep. 18, 2012).

need to "acquire and maintain additional equipment for product development and testing" so that it can speed up its inventive process, Appellant's Br. 12, by needing to hire attorneys at an earlier point in time, Appellant's Reply 6, and by needing to raise and expend money on applications which either might prove to be unsuccessful or need to be amended. Appellant's Br. 12–13. Given these business realities, MadStad asserts that it has shown sufficient probable economic injury to satisfy Article III's injury-in-fact requirement for standing.

While we are not prepared to accept the Government's characterization of what MadStad would need to show to establish standing—and specifically do not agree that filing and losing a derivative action is a necessary prerequisite to standing to challenge the first-inventor-to-file provision of the AIA—we conclude that, on the record before us, MadStad has not established standing based on its fear of being forced into filing a patent application sooner than it would prefer or would normally do.

Mr. Stadnyk is admittedly speculating about whether his current research and development will result in a patentable invention. Mr. Stadnyk admits that he still has more research, development, and testing to do before he can file a patent application, early or not. In other words, he currently has not filed, nor is he preparing to file, a patent application in the first-inventor-to-file system. His declarations, moreover, give no specific time frame in which he expects to file another patent application, other than to abstractly say he "believe[s] that some of [his] inventions are in fact close to patentability." J.A. 62–63. Though Mr. Stadnyk has filed for patent applications in the past, merely testifying that he intends to file for another patent at some unknown point in the future is not enough to meet the "concrete, particularized, and actual or imminent" injury requirement. *Monsanto*, 561 U.S. at 149; *see Lujan*, 504 U.S. at 564–65 (holding that professions of "'some day' intentions—without any de-

scription of concrete plans or indeed even any specifica-
tion of when the some day will be—do not support a
finding of the 'actual or imminent' injury that our cases
require").

We do not define exactly what steps a would-be patent
applicant would need to undertake to establish standing
to challenge the first-inventor-to-file provision of the AIA.
We merely hold that, on the record before us, MadStad
has failed to establish standing based on its fear of the
increased effort and costs involved in filing a patent
application because it does not assert that Mr. Stadnyk
has an invention for which an application could be filed.

c. Competitive disadvantage relative to competitors

MadStad also asserts that the AIA puts it at "compet-
itive disadvantages (relative to larger competitors) from
having to operate in a [first-inventor-to-file] environment,
which puts a premium on the ability to file numerous
expensive patent applications."  Appellant's Br. 20.
MadStad contends that the AIA forces small entities to
develop and test their products in-house because sending
developing products to outside vendors exposes them to IP
theft.  This requires small companies to divert some of
their limited resources to set up and maintain these in-
house development and testing centers, which larger
competitors already have in place.  In support of this
claimed injury, MadStad points to testimony from inves-
tors and to statements of members of Congress describing
how the first-inventor-to-file provision of the AIA, if
passed, would place small businesses at a competitive
disadvantage relative to larger competitors.

The Government responds that the patent system has
always incentivized inventors to file quickly to preserve
their rights, to avoid the chance of an interfering applica-
tion, and to avoid the later claim of concealment or sup-
pression.  The Government also points to the AIA's
creation of "derivation proceedings" to allow an inventor

to demonstrate that an invention disclosed was improperly derived—i.e., stolen from the inventor. Appellee's Br. 29 (citing AIA § 3(i) (codified at 35 U.S.C. § 135)).

Putting aside the protections derivation proceedings might provide patent applicants facing an earlier filing on the same invention, we find that MadStad's argument that it is at a competitive disadvantage because it is forced to compete with larger competitors that have a greater ability to file numerous patent applications fails for many of the same reasons its argument that it is injured by having to file additional applications fails. MadStad has not asserted that it has, in fact, set up in-house research facilities which it did not have in place before the AIA and has not even alleged that it is engaged in a research project that would employ or make use of any such new facilities. Again, we find MadStad's concerns too speculative and generalized to meet the "concrete, particularized, and actual or imminent" injury requirement. *Monsanto*, 561 U.S. at 149; *Lujan*, 504 U.S. at 564–65.[9]

MadStad's argument that it is at a competitive disadvantage relative to larger companies because it must divert resources to create in-house development and testing centers fails for additional reasons as well. Like MadStad's argument regarding the increased risk of hacking, the actual injury *fairly traceable* to the AIA here is too speculative to be imminent. *See Clapper*, 133 S. Ct. at 1150. In order for MadStad to suffer injury that is fairly traceable to the AIA we would have to assume, at

---

[9]     We note, moreover, that MadStad has alleged that it will be at a competitive disadvantage relative to larger competitors without actually alleging that there are in fact larger entities against which its inventions compete that have "the ability to file numerous expensive patent applications." Appellant's Br. 20.

least, that MadStad's outside vendors do not have adequate security measures in place to prevent hacking, hackers are prepared to and could successfully hack into the vendor's system, those hackers will discover MadStad's secret designs, and they will apply for a patent on those designs. This level of attenuation, which depends on the illegal motivations of third parties, is too speculative to be imminent for Article III purposes. *See id.* at 1147.

On the record before us, therefore, MadStad has failed to establish standing based on the alleged competitive disadvantage caused by the AIA relative to its competitors.[10]

### d. Lost business and investment opportunities

MadStad also alleges standing because the AIA inhibits it from sharing ideas with potential partners and investors, causing lost business and investment opportunities. Mr. Stadnyk declared that, because of the AIA, he already has been deterred from disclosing secret information to one potential investor who refused to sign a non-disclosure agreement. The Government again argues that MadStad's subjective and unsubstantiated fear that a potential investor will illegally "scoop" its inventions is too speculative to create Article III standing.

We agree with the Government that, under *Clapper*, the injury claimed by MadStad is neither fairly attributable to the AIA nor sufficiently imminent. *See Clapper*, 133 S. Ct. at 1147. While MadStad may have a subjective belief that it needs a non-disclosure agreement to dissuade any incentive to "scoop" its IP which the AIA cre-

---

[10]   Because we hold that the alleged competitive disadvantage injury is not imminent, we do not reach MadStad's argument that "competitive disadvantage is itself a form of cognizable injury." Appellant's Br. 27.

ates, we again find the threat of such injury too attenuated to create standing here. MadStad seems to believe that the threat of a civil breach of contract suit will dissuade a potential investor—who is otherwise willing to commit at least two criminal actions—from stealing its idea. *See* 18 U.S.C. § 1832 (2012) (criminalizing the theft of trade secrets); 37 C.F.R. § 1.67 (2012) (punishing willful false statements in an inventor's declaration by fine or imprisonment, or both). And, that it is the AIA, and only the AIA, which convinced the potential investor to resist a non-disclosure agreement. That is a rabbit hole which the imminency requirement prohibits us from going down.

We find that, on this record, MadStad has failed to show actual or imminent injury for lost business and investment opportunities.

### 2. The district court's reliance on *Clapper* was proper

MadStad also insists that the district court's reliance on *Clapper*, without considering other Supreme Court precedent, was improper. MadStad contends that the series of speculative assumptions the Government argues it must make here is far less attenuated than those in *Clapper*. MadStad emphasizes that *Clapper* was a case where the plaintiffs themselves were not directly affected by the Act. Appellant's Br. 39–40; Oral Argument at 5:29. While we concede that this distinction is meaningful, we, like the district court before us, find many of the general standing principles set forth in *Clapper* both enlightening and, ultimately, controlling. Yes, the facts in *Clapper* are even less conducive to a finding of standing than those MadStad asserts here, but the facts here still do not remove MadStad's injuries from the realm of speculation that damned the claims in *Clapper*.

In *Clapper*, the Supreme Court distinguished several of the cases on which MadStad relies on grounds that make this case distinguishable as well. For example, the Supreme Court distinguished *Monsanto* because "re-

spondents in the present case present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental action." *Clapper*, 133 S. Ct. at 1154 (citing *Monsanto*, 561 U.S. at 153–54). The farmers in *Monsanto* presented evidence showing that bees pollinated alfalfa and that their farms and the farms with genetically modified alfalfa were within the bees' pollination range. *Monsanto*, 561 U.S. at 153 n.3. In this case, on the other hand, as in *Clapper*, MadStad provides no concrete evidence to substantiate its fears that the AIA will increase the risk of IP theft (either by hackers or untrustworthy potential investors). *See Clapper*, 133 S. Ct. at 1153–54. Instead, MadStad's fears, like the challengers in *Clapper*, "rest on mere conjecture about possible [hacker or potential investor] actions." *Id.*

For further example, in *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000), standing was based on a company's continuous illegal discharge of pollutants into a river. 528 U.S. at 184. The polluter in *Laidlaw* conceded that the pollution was ongoing. *Id.* In *Clapper*, the Supreme Court distinguished *Laidlaw* because there was no evidence that the Government was using the statute at issue to acquire the challenger's communications. *See Clapper*, 133 S. Ct. at 1153. Similarly, in this case, MadStad does not allege or present evidence that anyone is actively trying to steal its intellectual property because of the AIA.

The Supreme Court in *Clapper* also addressed *Meese v. Keene*, 481 U.S. 465 (1987). In *Meese*, the Government had taken action that threatened to harm the plaintiff by labeling films that he wished to exhibit as "political propaganda." 481 U.S. at 473–75. In *Clapper*, on the other hand, the Government had not yet taken any action that threatened the plaintiffs and the standing theory was based on speculation about potential, future Government action. *Clapper*, 133 S. Ct. at 1153 (citing *Meese*, 481 U.S. at 473–74). Here, as in *Clapper*, MadStad's

alleged injury is based entirely on speculation about the potential, future activity of third parties. *See id.*[11]

MadStad finally argues that the trial court failed to consider an alternative test for standing under which it need only allege facts showing it has a "substantial risk" of injury. Citing to footnote 5 in *Clapper*, MadStad contends that the Supreme Court did not intend to displace this traditional test for Article III standing.[12] Because, according to MadStad, it faces a substantial risk of injury, it satisfies the Article III standing requirement even if the threat of harm is not otherwise "certainly impending." *See id.* at 1150 n.5. That brings us to the Supreme Court's most recent case addressing Article III standing, *Susan B. Anthony List*.

In *Susan B. Anthony List*, the Supreme Court held that a pro-life advocacy organization had the right to challenge the constitutionality of a statute criminalizing false statements made during an election because the Elections Commission had already found probable cause

---

[11] MadStad's reliance on the other cases in its brief is likewise unpersuasive. *See, e.g.*, *Mass. v. Envtl. Prot. Agency*, 549 U.S. 497, 518–21 (2007) (finding standing for a state, not a private party); *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 73–74 (1978) (finding standing for individuals living near a proposed nuclear power plant due to increase in non-natural radiation and thermal pollution).

[12] The Supreme Court explained that "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper*, 133 S. Ct. at 1150 n.5 (citing *Monsanto*, 561 U.S. at 153–54).

to believe the organization had violated the statute in the past based on behavior the Petitioner expressed a firm intention to repeat and the fact that the intended behavior would subject it to the threat of criminal prosecution and attendant penalties. *Susan B. Anthony List*, 2014 WL 2675871, at \*6–7. In finding standing, the Supreme Court reinforced previous decisions that made clear that a challenger need not expose himself to arrest or prosecution to challenge a statute as long as the threat of arrest or prosecution is sufficiently "credible." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979); *see Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (finding standing because the challengers faced a "credible threat" of prosecution); *Virginia v. Am. Booksellers Ass'n Inc.*, 484 U.S. 383, 393 (1988) (finding standing because the challengers "alleged an actual and well-founded fear that the law will be enforced against them"); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding that the challenger's fear of arrest was not "chimerical" because his companion has already been prosecuted).

Before discussing these cases and the principles from them the Court reinforced, the Court stated generally that "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending' *or* there is a 'substantial risk' that the harm will occur," citing both Clapper's text and its footnote 5. *Susan B. Anthony List*, 2014 WL 2675871, at \*5 (emphasis added). This sentence seems to support MadStad's argument that there is a separate "substantial risk" test that survived *Clapper* and that the district court should have considered. We need not decide whether these are alternative tests for standing applicable to all factual circumstances, however. As the Court did in *Clapper*, we find both that MadStad's alleged harms are not "certainly impending" and that MadStad has not alleged facts from which we can find that it faces a "substantial risk" of injury.

Unlike Susan B. Anthony List, MadStad has not identified a "history of past enforcement" to support its claim of injury, *id.* at \*9; MadStad neither asserts that it has previously sought a patent unsuccessfully, nor that it has a firm plan to do so at any defined point in the future. And, MadStad does not assert that any act it even hopes to undertake someday would subject it to criminal prosecution and potential criminal penalties. Most importantly, unlike the "substantial" and "credibl[e]" threat of Elections Commission action against Susan B. Anthony List, *id.* at \*9–10, MadStad's threat of harm depends upon speculation about the choices which might be made by third parties. For these reasons, we find that MadStad "falls short of even the [substantial risk] standard." *Clapper*, 133 S. Ct. at 1150 n.5 ("[R]espondents fall short of even [the substantial risk] standard, in light of the attenuated chain of inferences necessary to find harm here . . . . In addition, plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" (quoting *Lujan*, 504 U.S. at 562) (citations omitted)).

For all these reasons, we hold that the district court did not err by relying on *Clapper* or concluding that MadStad lacked standing to assert the constitutional claims in its complaint.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal for lack of standing.

**AFFIRMED**